Ethel **SMALL**, individually, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Julian **HUDSON**, Chairman, Lee County Commissioners, Kenneth Daniels, Vice Chairman, Lee County Commissioners, P. A. Geraci, Lee County Commissioner, and Robert Craft, Director, Lee County Welfare and their successors in office, Defendants.

Civ. No. 69–4.

United States District Court,
M. D. Florida,
Ft. Myers Division.

Dec. 18, 1970.

Judgment Feb. 5, 1971.

Enrique Escarraz, III, R. Lawrence DeFrances, Ft. Myers, Fla., for plaintiffs.

Frank A. Pavese, Ft. Myers, Fla., William T. Keen, Shackleford, Farrior, Stallings & Evans, P. A., Tampa, Fla., for defendants.

## OPINION

KRENTZMAN, District Judge.

This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201,[1] 2202,[2] and 42 U.S.C. §§ 1983,[3] 2000a–1.[4] Jurisdiction is invoked on the

---

1. 28 U.S.C. § 2201 provides:

"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

See also Rule 57, F.R.Civ.P.

2. 28 U.S.C. § 2202 provides:

"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

3. 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

4. 42 U.S.C. § 2000a–1 provides:

"All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, stat-

basis of 28 U.S.C. § 1343(3) [5] and 42 U.S.C. § 2000a–6.[6]

Plaintiff Ethel Small, an 87-year old black woman, sues individually and on behalf of all others similarly situated. Former plaintiff, James Floyd Johnson, died on March 19, 1969; upon a Suggestion of Death, he was stricken as plaintiff. Defendants are the Chairman, Vice Chairman, and Members of the Board of County Commissioners of Lee County, Florida, and Robert Craft, Director of County Welfare, County Homes, Lee County, Florida.[7]

The complaint was filed on January 31, 1969. Defendants' motion to dismiss was denied on July 29, 1969. Also on that date leave was granted to proceed as a class action pursuant to Rule 23(a), (b), F.R.Civ.P. The class consists of needy elderly or infirm Negro persons who reside in, or are otherwise eligible for admission to the county homes for the aged and infirm owned and operated by defendants, but who have been, or are being discriminated against by reason of defendants' practice of maintaining racially segregated county homes for the aged or infirm.

The case was tried to the Court in Fort Myers, Florida, on July 14, 1970. The trial consisted of the testimony of defendant Craft, statements of counsel, and the introduction of exhibits. A transcript of the trial has been prepared. Both parties have submitted proposed findings of fact and conclusions of law.

I.

Lee County owns two homes for the elderly located in Lee County, Florida; defendants maintain, finance and are responsible for the operation of the homes. The facilities are separate and unequal. One of the homes—Rest Haven Home for the Aged—has never in its history had an inmate who was not of minority group background.[8] The other home, Shady Rest Nursing Home, is traditionally white: it has had a total of 3 black patients, all of whom were admitted a few weeks before the trial of this case.[9]

ute, ordinance, regulation, rule. or order of a State or any agency or political subdivision thereof."

5. 28 U.S.C. § 1343(3) provides:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
* * * * *
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights or of citizens or of all persons within the jurisdiction of the United States."

6. 42 U.S.C. § 2000a–6(a) provides:
"The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law."

7. Defendant Craft has occupied this position since October 1961. Report of Proceedings at Trial (hereafter R.), 35.

8. Although defendant Craft testified that to his knowledge no "non-Negro or * * * non-White" had ever been in Rest Haven R., 40, defendant Hudson's Answers to Plaintiffs' Interrogatories 19 and 20, filed July 24, 1969, show that between 1966 and 1969 at least 5 and perhaps 7 whites of Puerto Rican descent were in Rest Haven. No persons of Puerto Rican ancestry were in the white facility during this period. Upon consideration of the entire record in this case—which shows that blacks have always been the overwhelmingly predominant population group at Rest Haven and that no white persons of non minority group descent have ever been patients there—the Court deems Rest Haven a black facility. It will be referred to as such in the course of this opinion, and its inmates will be considered to be black.

9. According to defendant Craft, these 3 were admitted no more than 6 weeks before the trial of this case. R., 41–42. This means that they were admitted no earlier than June 1, 1970.

The black facility, Rest Haven, is classified as a home for the aged under Florida law.[10] It generally has around 24 inmates. In terms of physical plant, personnel, and services it is grossly inferior to the white home, as defendants freely admit.[11] Shady Rest, the white facility, is a nursing home.[12] It has an average of around 84 patients and is in every measurable way superior to the black home.

## II.

At trial counsel for defendants conceded that prior to 1954 all public facilities in Lee County were segregated. Counsel for defendants quoted defendant Craft as saying that when he assumed office in 1961 there was a "custom" to put the races in separate facilities. Defendant Craft told his counsel that segregation was not maintained from the time he took over. Defendant Craft said that he gave blacks an opportunity to file an application with him—apparently he means an application for admission to Shady Rest. However, he took no affirmative steps to desegregate the homes. Applicants voluntarily asked him for the facility they wanted, and he never told them where to go.

In 1967, the federal government informed defendants that if they wished to receive federal aid, they must take overt steps to end segregation. On April 14, 1967, therefore, defendants posted on the bulletin boards of both homes an "Open Admission Policy Statement for Lee County Nursing Homes.[13] The Statement was published in the Fort Myers *News-Press* on that same date, and was also broadcast over local television and radio. As a final overt step, defendant Craft notified the old Florida State Department of Public Welfare of the publication of the Statement.

## III.

Rest Haven has always been a home for the aged; it was never licensed as a

10. Homes for the aged must be licensed in Florida. Section 400.041(1), Florida Statutes, F.S.A. A home for the aged is defined as a home providing domiciliary and custodial care. Sections 400.021 (6), 400.041(1), Florida Statutes, F.S.A.

11. For the complete figures relating to the great disparity between the two homes, see defendant Hudson's Answers to Plaintiffs' Interrogatories, filed July 24, 1969, and received in evidence at trial.

12. Under Florida law nursing homes are legally distinct from homes for the aged and in order to stay open must meet higher and more stringent requirements. They must be licensed, Section 400.041 (3), Florida Statutes, F.S.A., and are defined as institutions which provide nursing services in addition to custodial service. Sections 400.021(5), 400.041 (3), Florida Statutes, F.S.A. The Florida Department of Health and Rehabilitative Services is authorized to promulgate standards and regulations for nursing homes. Sections 400.041, 400.23, Florida Statutes, F.S.A.

13. The Statement reads:
"It is the policy of the Rest Haven and Shady Rest Nursing Homes to admit and to treat all patients without regard to race, color, or national origin. The same requirements for admission are applied to all, and patients are assigned within the nursing home without regard to race, color, or national origin. There is no distinction in eligibility for, or in the manner of providing, any patient service provided by or through the nursing home. All facilities of the nursing home are available without distinction to all patients and visitors, regardless of race, color, or national origin. All persons and organizations that have occasion either to refer patients for admission or recommend the Rest Haven or Shady Rest Nursing Homes are advised to do so without regard to the patient's race, color, or national origin."
The Statement was worded by the Florida Department of Public Welfare, predecessor of the present Division of Social Services of the Florida Department of Health and Rehabilitative Services. See Sections 409.015(1), 409.285 (2), Florida Statutes, F.S.A. and Chapter 69–106 § 19(15), Laws of Florida 1969.

Defendant Craft testified that the Statement was in error insofar as it referred to Rest Haven as a nursing home; Rest Haven was not a nursing home in 1967. R., 76.

nursing home, although it was used as one at times prior to 1967.[14] Prior to 1967, Shady Rest was also a home for aged. In that year it was licensed as a nursing home for the first time. Defendants disagree in explaining why Rest Haven was not converted into a nursing home in 1967. According to defendant Hudson's Answer to Plaintiffs' Interrogatory 15, a home for the aged license was requested for Rest Haven because of the unavailability of qualified personnel.[15] On the other hand, defendant Craft testified that Rest Haven remained a home for the aged because it had too many beds per room to qualify as a nursing home.[16]

Rest Haven is located in the black section of town. It is constructed of concrete block and has 2 wards, each with a capacity of 12 beds. The premises are owned by Lee County, but leased to a licensed practical nurse who manages the home. The County does not allocate funds for the operation of Rest Haven. Instead there is an arrangement whereby the manager collects the assistance checks of the inmates, pays 10% of these funds to the county for rent, and keeps the rest to run the home.[17] In some cases the county pays $121.50 a month for the board and keep of a patient.[18] The County maintains the premises.

Admission to Rest Haven is by voluntary application. Most patients at Rest Haven appear to be persons in need of *domiciliary care who requested admission.* There are others who sought admission to the white nursing home but were turned away because of the long waiting list, because they were not certified as in need of nursing care, or because of other reasons. It is the practice of defendant Craft to offer a bed at Rest Haven to those unable to gain admission to Shady Rest. Because there is usually an opening, there has never been a waiting list for applicants to Rest Haven. No white person has ever applied for admission.[19]

Shady Rest is located five miles from the black section of the community. It is made of concrete block, having 4 wings, 2 wards, and 2 rooms, with a total of 84 beds. Shady Rest is run directly by the county; its operating budget comes from county funds.

Admission to Shady Rest is also by voluntary application. No one is admitted unless he is first certified by a physician to be in need of nursing care. There are no standards whereby a physician determines whether a person needs nursing care or domiciliary care. Apparently each physician in the community has his own standards.[20]

Because of the demand for admission, a waiting list is used. A person is placed on the list at the time he submits his application. At present there are approximately 170 persons (120 females, 50 males) on the list. Only 5 of them are black. Despite the waiting list, admission to Shady Rest is not always on the basis of the earliest name chronologically on the list. *In emergency cases or in various other situations where defendant Craft feels the waiting list should*

---

14. This was the emphatic testimony of defendant Craft, and the Court accepts it as true. R., 36–37; 76. The Court therefore rejects the statement in defendant Hudson's Answer to Plaintiffs' Interrogatory 15 to the effect that Rest Haven was last licensed as a nursing home in 1966.

15. "Rest Haven is licensed as a Home for the Aged. Rest Haven last licensed as a Nursing Home in 1966. License never revoked or rejected. Request for change of license from Nursing Home to Home for the Aged was requested by Lee County Welfare due to the unavailability of qualified personnel, Registered Nurses, and Licensed Practical Nurses, as required by the Florida State Board of Health."

16. R., 59–60.

17. R., 55; 103–104.

18. R., 106.

19. Since there is no waiting list at Rest Haven and there have never been any whites there, it follows that no whites have ever applied. Cf. R., 40; 57.

20. R., 93.

be discarded, persons on the list are passed over in favor of others who applied at a later date.[21] There are no regulations to limit or control defendant Craft's judgment in determining whether or not to admit someone to Shady Rest ahead of persons on the list who applied earlier. Adherence to the waiting list is therefore at the absolute discretion of defendant Craft.

Although the Shady Rest waiting list was opened to blacks in April 1967, the first black application was not received until January 1968.[22]

No patient at Rest Haven is currently on the Shady Rest waiting list, even though at least two of them are in need of nursing care. Defendant Craft does not place on the list persons in need of nursing care who are denied admission to Shady Rest but accept his offer of a bed at Rest Haven. Nor does he add to the list the names of Rest Haven inmates whose conditions worsen so as to require nursing care. Through the licensed practical nurse there defendant Craft claims to keep careful track of Rest Haven patients. If a patient's condition appears to warrant nursing care, he has the prerogative of exercising several alternatives. He may transfer the patient to the hospital, or get the patient into a private nursing home, or put the patient on a mental list—known only to him and his caseworker—for admission to Shady Rest.

The case of plaintiff Ethel Small is illustrative. She initially applied for admission to Shady Rest but was turned away for want of a vacancy.[23] At the time of her application she was in need of nursing care, although she had not been so certified by a physician.[24] After her rejection she accepted defendant Craft's offer of immediate admission to Rest Haven. When first questioned, defendant Craft stated that Mrs. Small was on the Shady Rest waiting list. When a close examination of the list failed to

disclose her name, defendant Craft admitted that the only list she was on was an intangible one in his mind. He did add that Mrs. Small was one of the Rest Haven patients in need of nursing care and that he had promised himself that he would move her to Shady Rest.

If there are persons in need of nursing care at Rest Haven, there are also persons at Shady Rest who need only domiciliary care. Of the 84 patients now in Shady Rest, between 65 and 70 require nursing care, while the rest do not.[25]

### IV.

Racial segregation in Lee County was *de jure* until 1954. It was a "custom" at Rest Haven and Shady Rest until October 1961, when defendant Craft took office. From 1961 until 1967 nothing changed, despite defendant Craft's desegregated heart and uncommunicated intention to admit blacks to Shady Rest. In April 1967, at the request of the federal government, the defendants took their first affirmative steps to desegregate the facilities. Defendants published and broadcast their Open Admission Policy Statement. It was publicly announced that no person would be barred from either of the homes on account of race. The first black application at Shady Rest was submitted in January 1968; the only 3 blacks ever in Shady Rest were admitted around June 1, 1970. No white person has ever applied at or been admitted to Rest Haven.

■ Against this background of racial discrimination, defendants' present methods of operating Shady Rest and Rest Haven violate the Fourteenth Amendment. This is so principally because defendants have failed to take the significant, positive steps required to desegregate public facilities. Defendants contend that so long as they abolish official segregation they need not do more. It is their position that while they may

---

21. See, e. g., R., 68; 74; 99.

22. R., 21; 91; 111.

23. R., 77, 78.

24. *Id.*; 97.

25. R., 43; 44; 99–100.

not maintain segregated facilities, they are not required to take affirmative steps to desegregate them.[26]

In Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I), the Supreme Court of the United States declared the fundamental principle that racial discrimination in public education is unconstitutional. The basic holding of that case—that discrimination on the basis of race contravenes the Equal Protection Clause of the 14th Amendment—has been expanded to include all areas of State action. In Johnson v. Virginia, 373 U.S. 61, 62, 83 S.Ct. 1053, 1054, 10 L.Ed.2d 195 (1963), the Supreme Court said: "[I]t is no longer open to question that a State may not constitutionally require segregation of public facilities." In Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, the Court said: "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, *or in any way act to compel or encourage racial segregation.*" (Emphasis supplied.)

In Brown v. Board of Education of Topeka, Kansas, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), the Supreme Court directed the defendant school boards "to effectuate a transition to a racially nondiscriminatory school system." 349 U.S., at 301, 75 S. Ct., at 756. And in Green v. School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court said:

"Brown II was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U. S., at 437–438, 88 S.Ct., at 1694.[27]

██ It is the view of the Court that the principles which govern the desegregation of public schools are not inapplicable to other governmental facilities.[28] If the States have a duty to disestablish segregation in their schools, voting practices, or juvenile homes, then they have a corresponding duty as to their other facilities and must undo segregation in homes for the elderly. Lee County has

---

26. R., 14–16; 38–39.

27. For other cases dealing with the affirmative duty of the States to desegregate their public schools, see United States v. Jefferson County Board of Education, 372 F.2d 836 (5 Cir. 1966), aff. en banc 380 F.2d 385 (1967), cert. den. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Dowell v. Board of Education of Oklahoma City Public Schools, 396 U.S. 269, 90 S.Ct. 415, 24 L.Ed.2d 414 (1969); Northcross v. Board of Education of Memphis, Tenn. City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970).

28. See, e. g., Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed. 2d 709 (1965) (racial discrimination in voting laws); Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (5 Cir. 1969) (racial discrimination in employment practices). Crum v. State Training School for Girls, 413 F.2d 1348 (5 Cir. 1968) (discrimination in reform schools for juveniles). In the latter case, after observing that "[o]n these facts, the Negro school would flunk the Plessy v. Ferguson [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)] test. Its overcrowded condition and plainly inferior facilities are enough in themselves to require the immediate and simultaneous desegregation of all three schools," 413 F.2d at 1349, The Fifth Circuit ordered the schools "to present one plan for the system as a whole that will accomplish *immediate* and total desegregation of each school." 413 F.2d, at 1350.

not met the burden imposed upon it by the Constitution.

At Shady Rest, defendants have instituted and published an open admission policy, with the result that 3 blacks have been admitted and 5 of the 170 persons now on the waiting list are black. These steps are on their face insufficient to discharge defendants' constitutional responsibility. Defendants have at no time transferred to Rest Haven any of the Shady Rest patients in need of domiciliary care only; nor have they taken any other actions which, by their effect on the Shady Rest population, would demonstrate presently and decisively that Shady Rest is no longer a facility set aside exclusively or predominantly for whites.

At Rest Haven, the only affirmative step taken in the direction of desegregation was the publication of the Open Admission Policy Statement. The Statement provided that "[i]t is the policy of * * * Rest Haven * * * to admit and to treat all patients without regard to race, color, or national origin." Aside from this notification that whites would be permitted at Rest Haven, defendants have done nothing to abolish segregation there. Here again it is the failure of defendants to act that is important. Despite his wide discretionary powers with regard to admissions, defendant Craft has not acted in such a way as to cause Rest Haven to shed its traditional image as a black facility. Not one of the pa-

tients in need of nursing care has been transferred to Shady Rest; nor has the facility received any of the Shady Rest patients in need of domiciliary care alone.

The problem at Rest Haven has been compounded by defendants' conversion of Shady Rest into a nursing home in 1967. This conversion, when considered in light of defendants' failure to act positively to desegregate, has had the effect of discouraging white applications at Rest Haven. Segregation was the reason that Rest Haven was not converted into a nursing home like Shady Rest. Prior to 1967, when both homes were classified as homes for the aged, Shady Rest was nevertheless the far superior facility.[29] Although he was imprecise in details, defendant Craft's testimony made it clear that Shady Rest was approved for nursing home status because of its excellent facilities, whereas Rest Haven, because of its marginal facilities, was incapable of effecting the same change of status.[30] Once the conversion was made, it enabled defendants—as they do now—to justify the disparity between the institutions on the ground that they are entirely different type homes. Defendants have ignored the reality that the reclassification itself was the product of defendants' maintenance of separate and unequal facilities. The conversion of Shady Rest has allowed defendants to carry forward the inequality in the facilities; and this continued inequality, conjoined with the

29. For example, for the year 1966–1967 (that is, at a time when both facilities were classified as homes for the aged) the operating budget of Shady Rest was $251,874.76, compared with Rest Haven's budget of $13,500.00. See defendant Hudson's Answer to Plaintiffs' Interrogatory 1.

30. Defendant Craft testified specifically that Rest Haven was not classified as a nursing home because it could not meet the State requirement that there not be over 8 beds in a wing. (Rest Haven has 2 wards, each with 12 beds.) Because of its capacious facilities, Shady Rest was apparently able to meet this requirement, despite defendant Craft's

contradictory observation that Shady Rest now has 2 wings with 10 beds each. R., 59–61. The Court cannot accept defendant Hudson's position (see his Answer to Plaintiffs' Interrogatory 15) that Rest Haven was not made a nursing home because of an insufficiency of qualified personnel. For one thing, it is unlikely that defendants would be unable to staff Rest Haven when they are able to adequately staff Shady Rest, a much larger facility. Second, defendant Hudson's explanation is intertwined with his erroneous earlier statement that Rest Haven was a nursing home until 1966, at which time it was reclassified as a home for the aged.

failure to desegregate positively, has undoubtedly tended to deter potential white applicants.

Some of the defendants' failure to eliminate segregation completely is no doubt due to the fact that the task is not easy. Shady Rest, for example, is located 5 miles from the black community, and because of this blacks are reluctant to enter Shady Rest for fear of having no visitors. And Rest Haven remains in the heart of the black community. But it goes without saying that the very magnitude of the former segregated system cannot lessen defendants' obligation to dismantle that system.

Thorough desegregation of Rest Haven and Shady Rest, then, has never been attempted. Three years after defendants' initial steps toward desegregation the facilities are still separate and unequal, with little prospect of change in the future. This would not be the case had defendants fulfilled their constitutional responsibilities.[31]

A second reason why the homes are not being operated in conformity with the Constitution lies in defendants' admission policies. Whatever its purpose, defendant Craft's policy of admitting to Rest Haven persons rejected at Shady Rest has the effect of retaining segregation at both homes. Because of defendants' failure to end discrimination by positive action—specifically, because of Rest Haven's vastly inferior facilities, its location, its continuing historic identity as a black institution, and the racial composition of its inmates—few whites are inclined to accept the offer, and indeed not a single one ever has. At the same time, and also because of defendants' lack of positive action, blacks are likely to accept the offer instead of signing up at the end of the Shady Rest waiting list. Once they have accepted the offer, defendant Craft's practice of not placing them on the Shady Rest waiting list makes it unlikely that any of them ever will enter that facility.

■ Defendant Craft's policy of providing space at Rest Haven for those turned away from Shady Rest therefore encourages blacks to follow the same old ways and discourages whites from venturing into Rest Haven. In conjunction with defendants' lack of affirmative action it is unconstitutional because it assures that the homes retain their racial identity and because it encourages and significantly involves the defendants in private discrimination. Cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).[32]

The way in which defendants integrated the Shady Rest waiting list has also contributed to the continuance of segregation. When defendants opened the list to blacks in April 1967, they began adding black applicants to the list as of the time of their application. This procedure discriminated against blacks who would have applied prior to 1967 if they had not been barred from doing so. Had these blacks applied after 1967 they would have found themselves farther down on the list than they would have been if there had not been past discrimination. The record does not reveal the identity of these blacks. But on the ba-

31. Defendants stress that admission to the homes is voluntary, and that therefore they cannot control admissions or explain why no whites enter Rest Haven and so few blacks enter Shady Rest. The Court is of the view that defendants are not barred from taking the positive and public steps which will in a meaningful and effective way assure the availability of the homes to all persons in the community, regardless of race and past practices.

32. In *Reitman* the Supreme Court held that an amendment to the California Constitution which granted the constitutional right of racial discrimination in housing to private citizens was unconstitutional because the amendment would "encourage and significantly involve the State in private racial discrimination contrary to the Fourteenth Amendment." 387 U.S., at 376, 87 S.Ct. at 1632. The case stands for the proposition that a State cannot engage in practices which encourage private racial discrimination. Cf. Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

sis of the evidence the Court may reasonably infer their existence. Defendants made no effort to ascertain whether any of the blacks who applied from January 1968 onward would have applied earlier if they had not been barred from the list. Nor did they attempt to seek out with an offer of a retroactive place on the list blacks who had desired and been qualified for admission to Shady Rest prior to 1967.

At present there are 32 females and 5 males on the list who applied prior to April 1967.[33]

### V.

The results of defendants' present method of operating the two homes are indisputable. Three years after they were announced desegregated the facilities remain separate and unequal. Rest Haven is still all black. It is still the inferior institution, although defendants now justify that inferiority on the ground that it is a home for the aged and not a nursing home. Shady Rest remains the white facility, with the exception of a single black patient, 1 of 3 blacks hastily admitted shortly before trial. It is still in every way the better facility.

Although defendants care for at least 3 blacks in need of nursing care, 2 of them are in the home for aged, where they do not receive the nursing care they deserve. In contrast, every white in need of nursing care receives such care, while the 14 to 19 whites in need of domiciliary care alone receive nursing care.

The only way that blacks may now be admitted to Shady Rest is if defendant Craft exercises his uncontrolled discre-

tion to manipulate the waiting list. There is no indication that any white will ever apply at Rest Haven.

Unless defendants' policies are changed, there is no reasonable prospect that Rest Haven will not remain all black in the future, or that Shady Rest will not remain virtually all white.

### VI.

This is both an indivdual action on behalf of plaintiff Ethel Small and a proper class action. See Rule 23, F.R.Civ.P. The Court has jurisdiction of the parties and of the subject matter. 28 U.S.C. § 1343(3); 42 U.S.C. § 2000a–6.

The United States Constitution and federal law prohibit a State or its agents from operating any facility on a racially discriminatory basis. U.S.Const. Amend. 14; 42 U.S.C. § 2000a–1; *Brown I* and *II supra; Johnson v. Virginia, supra;* Adickes v. S. H. Kress & Co., *supra;* Board of Managers of Arkansas Training School for Boys at Wrightsville v. George, 377 F.2d 228 (8 Cir. 1967); Singleton v. Board of Commissioners of State Institutions, 356 F.2d 771 (5 Cir. 1966); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), aff. 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Defendants' operation of the two homes constitutes State action because: (1) Lee County, a political subdivision of Florida, owns the homes;[34] (2) defendants, agents of the State of Florida, operate, maintain and manage the homes;[35] and (3) operation of the homes is funded partially by federal, State and local government monies.[36]

For the reasons given in the course of this opinion, defendants are

---

33. Defendants' Exhibits 1 and 2.

34. No legal proposition is more fundamental than that facilities owned by a State or one of its subdivisions cannot be operated in a racially discriminatory manner. Johnson v. Virginia, *supra;* Cf. Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

35. Counties and county officers are instrumentalities of State power. Reynolds v. Sims, 377 U.S. 533, 575, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

36. Shady Rest is run through funds provided by Lee County. Rest Haven is operated on the basis of federal, State and local assistance checks given the inmates.

operating Rest Haven and Shady Rest in contravention of the Constitution and federal law. As a consequence irreparable harm is being done plaintiff and the class she represents.[37] Accordingly, plaintiff and the class are entitled to injunctive and declaratory relief, as prayed for in the complaint.

The Court will withhold the issuance of relief pending submission by defendants of a plan for desegregating the homes. Such a plan shall provide for the immediate and complete desegregation of the facilities and shall "fully and completely implement the letter and the spirit of this decision." Rackley v. Board of Trustees of Orangeburg Regional Hospital, 238 F.Supp. 512, 520 (E.D.S.C. 1965). The plan is to be submitted to the Court within 40 days. Upon receipt of the plan the Court will enter its final judgment, if appropriate; if necessary, further hearings will be scheduled or additional memoranda requested. An order is being entered this date instructing defendants to file the plan.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

### JUDGMENT

This action having come on for hearing before the Court, and the issues having been duly heard and Findings of Fact and Conclusions of Law having been entered, and the defendants having submitted their Plan for Desegregation, it is

Ordered and adjudged:

1. Defendants' present methods of operating Rest Haven for the Aged and Shady Rest Nursing Home are hereby declared to be in contravention of the Fourteenth Amendment to the United States Constitution.

2. Defendants, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of this permanent injunction by personal service or otherwise, are hereby permanently enjoined as follows:

(a) Defendants are directed to give each of the present occupants of Rest Haven a permanent number based on the length of time that the person has been an inmate of Rest Haven, with the patient there for the longest time to be given the lowest number, and so on.

(b) Immediately upon the occurrence of each vacancy or space at Shady Rest after the date of this judgment, defendant shall forthwith transfer to Shady Rest the occupant of Rest Haven of the appropriate sex with the lowest number among its occupants at the time of the transfer.

(c) Defendants are directed to admit no more persons to Rest Haven after the date of this judgment, and to close the facility permanently after all its occupants have been transferred to Shady Rest.

(d) Defendants are restrained from admitting to Shady Rest anyone not an occupant of Rest Haven until all persons of the appropriate sex have been transferred from Rest Haven to Shady Rest.

(e) Once Rest Haven has been closed and all its inmates transferred to Shady Rest, defendants are restrained from practicing racial discrimination in their operation of Shady Rest. Specifically, defendants are directed to admit and treat all patients at Shady Rest without regard to race or color. The same admission requirements shall be applied to all applicants, and there shall be no discrimination on the basis of race in admitting patients. All facilities and patient services at Shady Rest shall be available to all patients, regardless of race or color. There shall be no racial discrimination in the assignment of patients to the rooms, wings, and wards of Shady Rest. There shall be no racial discrimination against visitors or

---

37. Racial discrimination is per se irreparable harm to the minority group. Brown

I, 347 U.S., at 493–495, 74 S.Ct. 686. 98 L.Ed. 873.

**530**

against patients on account of the race of their visitors. In administering the waiting list for admission to Shady Rest, defendants shall add names to the list without regard to race and in chronological order. Defendants shall deviate from the list and admit a person ahead of others who applied earlier only on the basis of written rules specifying the instances in which the waiting list may be discarded. Said rules shall in no case be altered retroactively.

3. Defendants shall post copies of this judgment at Rest Haven and Shady Rest until January 1, 1972.

4. Costs of this action shall be taxed against defendants.