## SOUTH FLORIDA CHAPTER OF THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., et al., Plaintiffs,

### v.

## METROPOLITAN DADE COUNTY, FLORIDA, et al., Defendants.

### No. 82–2427–Civ–JWK.

United States District Court, S.D. Florida.

Dec. 16, 1982.

David V. Kornreich and Gordan Dean Rogers, Miami, Fla., for plaintiffs.

Robert A. Ginsburg and R.A. Cuevas, Jr., Miami, Fla., for defendants.

Theodore Klein, Miami, Fla., for Thacker Const. Co.

Leon E. Sharpe, Miami, Fla., for Allied Contractors Ass'n and Alfred Loyd & Sons, Inc.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEHOE, District Judge.

### I.

This is an action alleging, among other things, that plaintiffs are being discriminat-

ed against because of their race in violation of the Fourteenth Amendment to the United States Constitution. The central issue for determination is important and fundamental: how far can a local government apply a race conscious affirmative action plan before that plan violates a person's constitutionally guaranteed right to the equal protection of the laws? Put another way, may a local government initiate a race-conscious policy of favoring a disadvantaged minority group at the expense of members of a non-minority group?

Plaintiffs are White construction contractors and subcontractors who have been adversely affected by Metropolitan Dade County's recently enacted race-conscious ordinance. This ordinance has two major features: a "set-aside" provision that limits competition for certain designated county contracts exclusively among Black contractors; and a "goals" provision that sets a certain percentage dollar amount of a county contract to be subcontracted to Black contractors.

For reasons fully explained in the body of this opinion, it is the considered judgment of the Court: (a) that the "set-aside" provision of the county's race-conscious ordinance conflicts with the equal protection clause of the Fourteenth Amendment; and (b) that the "goals" provision falls within the ambit of county discretion and is constitutionally permissible. Accordingly, plaintiffs are entitled to a judgment declaring that the set-aside provision of the defendants' race conscious policy is unconstitutional, and a permanent injunction enjoining the defendants from applying the set-aside to the contract that is the subject of this action.

## II.

Plaintiffs are non-profit corporations and trade associations challenging certain ordinances, resolutions and policies enacted by Metropolitan Dade County and mandating that minority set asides and goals be established for selected county construction contracts to be bid and awarded. The defendants are the county, its Board of County Commissioners, the county manager and the county transportation coordinator.

Plaintiffs filed their complaint seeking a declaratory judgment and injunctive relief on November 12, 1982. Jurisdiction over this cause was invoked pursuant to 28 U.S.C. § 1343 as an action seeking relief under 42 U.S.C. §§ 1981 and 1983 (the civil rights acts) and 28 U.S.C. §§ 2201 and 2202 (declaratory judgments). The Court's pendent jurisdiction was invoked over two related state claims.

On November 15, 1982 plaintiffs filed their motion for preliminary injunction, or in the alternative, motion for a temporary restraining order, seeking to enjoin the county from opening the bids submitted on the Earlington Heights Metrorail Station project. Since these bids were scheduled to be opened on November 17, 1982, the Court held a hearing on the motion for a temporary restraining order on November 16, 1982. The defendants were notified of this action and of the scheduled hearing, and appeared in opposition to the motion. At the conclusion of the hearing, after receiving testimony of witnesses and argument of counsel, the Court announced that it would issue a temporary restraining order against the defendants. The following day a temporary restraining order was issued restraining the defendants from opening the bids for the Earlington Heights Metrorail Station project, contract no. N336R, and from taking any other action to finally award this contract to any bidder pending a final determination of the merits of plaintiffs' complaint.[1] By this written order and previous announcement, the Court accelerated this cause for final hearing to com-

---

1. The Court found that plaintiffs met the four criteria for injunctive relief set out in *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974): (a) that there was a substantial likelihood that plaintiffs would prevail on the merits; (b) that plaintiffs would suffer irreparable injury if injunctive relief was not granted; (c) that the threatened harm to the plaintiff outweighed the threatened harm the injunction may do to the defendants; and (d) that the granting of injunctive relief would not disserve the public interest.

mence on November 26, 1982 and directed the defendants to file their answer to the complaint by November 23, 1982. Also, by separate order, the Court permitted intervenor Thacker Construction Company to intervene as a party defendant. Just prior to the final hearing, Allied Contractors Association and Alfred Loyd & Sons, Inc. also filed a joint motion to intervene in this action. This motion was granted *ore tenus* by the Court.

This cause came on for final hearing on November 26, 1982 at which extensive evidence was adduced and legal argument heard from all parties.[2] At the conclusion of this hearing the Court took all of the issues under consideration pending the release of this memorandum opinion. After considering the entire record developed in this proceeding[3] as well as all of the legal memoranda submitted, the Court now makes its findings of fact and publishes its conclusions of law in accordance with Fed. R.Civ.P. 52(a).[4]

### III.

The Court makes the following findings of fact:

### A.

1. Plaintiff South Florida Chapter of The Associated General Contractors Of America, Inc. (the "general contractors") is a Florida not-for-profit corporation with its principle offices and place of business in Dade County, Florida, and is organized for the purpose of furthering and representing the interests of general contractors in the construction industry. This plaintiff is a trade association which has a membership comprised of, *inter alia,* sixty-two general contractors, many of whom regularly bid on

and perform construction work for Metropolitan Dade County.

2. Plaintiff Engineering Contractors Association Of South Florida, Inc. (the "engineering contractors") is a not-for-profit corporation having its principle offices and place of business in Dade County, Florida. This Plaintiff is a trade association comprised of eighty-two member firms which include, *inter alia,* general contractors, many of whom regularly bid on and perform construction work for Metropolitan Dade County. Plaintiff's members also include, *inter alia,* subcontractors, many of whom regularly bid on and perform construction work for Metropolitan Dade County.

3. Plaintiff Air Conditioning, Refrigeration, Heating And Piping Association, Inc., a/k/a Mechanical Contractors Association Of South Florida (the "mechanical contractors") is a Florida not-for-profit corporation, having its principle office in Dade County, Florida and is organized to further and represent the common interests of mechanical contractors in the construction industry. The membership of this plaintiff is comprised of more than eighty mechanical contractors and subcontractors, many of whom regularly bid on and perform construction work for Metropolitan Dade County.

4. Defendant Metropolitan Dade County, Florida, ("Dade County" or "county"), is a chartered political subdivision of the State of Florida operating under Article VIII, Section 6 of the Florida Constitution of 1968, the Dade County Home Rule Charter and the laws of the State of Florida. At all times material herein, Dade County, through its Office of Transportation Ad-

---

**2.** The intervenors chose not to present any evidence of their own but relied instead on the defense presented by the county defendants. Both intervenors were permitted oral argument and submitted memoranda of law on the legal issues raised by this action.

**3.** For the purposes of this memorandum opinion the Court has incorporated all of the evidence introduced at the hearing on the motion for a temporary restraining order of November

16, 1982 and the final hearing of November 26, 1982. The transcripts of both hearings have been consulted in the preparation of this opinion.

**4.** To the extent that any of the findings of fact constitute conclusions of law they are adopted as such. Conversely, to the extent that any of the Court's conclusions of law are found to be findings of fact, they are so adopted.

ministration, was engaged in the construction of a mass transit system generally known as the Metrorail System, including the Earlington Heights Station, contract N336R. As the owner of the Metrorail System, the county was responsible for establishing bid procedures and specifications on all Metrorail projects, including the Earlington Heights Station.

5. Defendants Barbara M. Carey, Clara Oesterle, Beverly B. Phillips, James F. Redford, Jr., Harvey Ruvin, Barry D. Schreiber, Ruth Shack, Jorge E. Valdes and Stephen P. Clark comprise the membership of the Board of County Commissioners of Dade County (the "county commission" or "commission"). At all times material herein, defendants Carey, Oesterle, Phillips, Redford, Ruvin, Schreiber, Shack, Valdes and Clark voted on and passed all ordinances, resolutions, and policies mandating the establishment of Black prime contractor set-asides and Black subcontractor goals on all Dade County construction projects, including Metrorail construction projects. The county commission specifically established and implemented Resolution No. R1350–82, requiring that the Earlington Heights Metrorail Station project, contract no. N336R, be set-aside for a Black prime contractor only and that fifty percent or more of the value of the prime contract on such project be set-aside for Black subcontractors.

6. Defendant Merrett Stierheim is the county manager of Dade County (the "county manager" or "manager"). At all times material herein, Mr. Stierheim was the Chief Administrative and Executive Officer of Dade County and was responsible for the implementation and administration of all ordinances, resolutions, and policies established by the commissioners, including those relating to the establishment and implementation of Black set-asides and goals on Metrorail System construction projects and other Dade County construction projects.

7. Defendant Warren J. Higgins is the Transportation Coordinator of Dade County's Office of Transportation Administration. At all times material herein, Mr. Higgins (the "transportation coordinator"), acting under the supervision and the direction of the county manager, was the Metropolitan Dade County official primarily responsible for the bid procedures and specifications on the Metrorail System, including the Earlington Heights Station Project, contract no. N336R.

8. Intervenor Thacker Construction Co. ("Thacker") is an Illinois Corporation with its principal place of business in Illinois, but licensed to do business in the State of Florida and maintaining an office in Dade County, Florida. Thacker is in the general contracting business in Dade County, Florida and is presently performing construction work for Dade County as a prime contractor on the North Bus Maintenance Facility project. Intervenor Thacker initially bid the Earlington Heights Station project on July 21, 1982 and is presently rebidding that project.

9. Intervenor Allied Contractors Association, Inc., ("Allied" or "Allied Contractors"), is a Florida not-for-profit corporation with its principle office and place of business in Dade County, Florida. Intervenor Allied is a trade association organized for the purpose of furthering and representing the interests of Black contractors and subcontractors in the construction industry. Members of Allied Contractors regularly bid on and perform construction work for Metropolitan Dade County. Intervenor Alfred Lloyd And Sons, Inc., ("Alfred Lloyd") is a Black-owned contractor and is a member of Allied Contractors.[5]

B.

10. In recent years Dade County has experienced tremendous demographic and social change. As a consequence of the Hispanic migration to Dade County, non-Hispanic Whites no longer constitute a ma-

5. The foregoing findings of fact have been stipulated to by plaintiffs and the county. See joint stipulation filed November 30, 1982.

jority of the county's population, although they barely remain the largest of the three ethnic groups. The Black population has dropped from second to third in size. Dade County estimates, based on preliminary 1980 Census data, indicate that Hispanics now comprise 41 percent of the population, Blacks 16 percent, and non-Hispanic Whites 43%. At the time this case was commenced, the Black population of Dade County was estimated to be 17.2% based upon final census data.

11. Dade County's economy has grown consistently faster than that of the nation as a whole. In 1956, the private sector provided 224,000 jobs in approximately 20,-000 different business establishments in Dade County. Twenty-one years later, the private sector economy had added another 300,000 jobs and 18,000 establishments. The job market increased 133.4 percent, and there was a 92.2 percent increase in the number of businesses. Nationally, during the same period, the number of jobs had grown only 59.7 percent and the number of business establishments only 39.1 percent. Similarly, the wholesale and retail trade industries in Dade County added 78,131 jobs and 6,350 businesses between 1956 and 1977, increases of 103.4 percent and 89.5 percent, respectively. Nationally, jobs in the same industries grew only 65.9 percent and new establishments only 39.1 percent during the same period.

12. In the construction industry, however, the national rate of growth for the period from 1956 to 1977 exceeded Dade County's rate. The number of jobs in the construction industry increased 40.9 percent nationally and 21.3 percent in Dade County, and the number of construction businesses increased 49 percent nationally and 39.3 percent in Dade County.

13. Statistical data in the record indicates that in 1977 only one percent of business establishments in Dade County were Black-owned. Of these, about 82 percent are owner operated with no additional employees. In the county's expenditures for major services and professional services agreements, only 2 percent of these contracts have gone to Black-owned businesses, amounting to 3.7 percent of the dollars expended. In the awarding of construction contracts and procurement, less than 1 percent of the firms involved being Black-owned, the dollar amount expended for contracts awarded to Black-owned firms amounted to only 1.4 percent of the total dollar value of all county construction contracts let.

### C.

14. In the aftermath of the May, 1980 Liberty City civil disturbances, Dade County set out to investigate and assess the present extent of Black business activity within the county generally and specifically in relation to doing business with Dade County. Several investigations were undertaken by outside consultants and committees into the underlying causes of these civil disturbances. Included among their findings was an analysis of the extent to which Black businesses received county contracts. The findings, conclusions and recommendations are set forth in these reports and studies: the Black Business Disparity Study, Prepared by the Disparity Study Group Task Force (October 27, 1981); Black-Owned Businesses in Metropolitan Miami, A Statistical Analysis of U.S. Census Data, prepared by Tony E. Crapp, Sr., Director, Business Development Division, Department of Trade and Commerce Development, City of Miami (December, 1980); An Economic Adjustment Plan for the Civil Disturbance Areas of the City of Miami and Dade County, prepared by Janus Associates (May, 1981); and the Report of the Governor's Dade County Citizens' Committee (October 30, 1980).[6] These reports formed the basis for the development of the county's race-conscious policy.

---

**6.** A later report issued by the United States Commission on Civil Rights called "Confronting Racial Isolation In Miami," was released in June 1982. The findings and recommendations contained in that report confirmed much of what the earlier reports said. The county later adopted the Civil Rights report in addition to the others. See Finding of Fact No. 28.

a. The Report of the Governor's Dade County Citizens Committee listed the major causes leading to the civil disturbances as (1) poverty, unemployment and underemployment; (2) slum housing and living conditions; (3) functional illiteracy; (4) the perception among Blacks of the local criminal justice system; (5) inadequate youth recreational facilities and activities; (6) political deprivation; (7) hard core juvenile delinquency; and (8) the general failures of society. The report contained a number of recommendations designed to expand the employment opportunities for Blacks, improve the quality of public and low cost housing, increase the complement of Black police officers, and provide special educational attention for Black students. The report concluded with an eloquent plea for cooperation from all levels of government, and all sectors of the community, to join together to create the type of overall program required to eliminate the underlying causes of racial tension in Dade County.

b. A second report entitled "An Economic Adjustment Plan for the Civil Disturbance Areas of the City of Miami and Dade County" (the "Janus Report"), was made by Janus Associates, a private consulting firm. This report was intended to be a comprehensive evaluation of the economic situation in the Black communities of Dade County as part of an overall proposal for the development of an economic and adjustment assistance plan for the areas impacted during the 1980 civil disturbances. Although this report made numerous findings as to the economic condition of the local Black population, and offered a number of recommendations, for our purposes, only a couple need to be mentioned. The report found that Black business development in Dade County lagged far behind, not only that of the local White and Hispanic communities, but that of Blacks in most major cities elsewhere in the United States. This and other disparities between the Black community and the rest of the county represented a major threat to Miami's continued growth and development as a center of international trade, commerce and tourism. Along with its other recom-

mendations, Janus urged the development of affirmative action and set-aside programs to maximize the opportunities of Black-owned businesses in the public sector.

c. In passage after passage in the Janus report, the authors described the critical nature of the economic condition in the Black community. Several short selections deserve quotation:

The Black community presently lacks the tools of development necessary for economic growth and the confidence that economic progress can occur. There are few capital instruments in and for the Black community and few strong, experienced and well-supported Black economic and business development organizations. Entrepreneurial development is minimal, and there are few models of business success to inspire and provide examples for potential businesspersons.

Janus Report at III–2.

Against th[e] background of a thriving, growing regional economy, the economic and demographic profile of the Black community of Dade County projects a contrasting picture. Alone among the . . . three major population groups, Blacks have not participated equitably in this general prosperity or in the major growth sectors, in terms of either jobs or business development.

Ibid. at IV–16.

Janus' assessment is that the Black community of Miami remains frustrated and explosively volatile, and that only a sustained, all-out effort to remove the disparities that separate Blacks from the rest of the community will reverse this deeply entrenched mood.

Ibid. at V–17.

d. The Black Business Disparity Study Management group found that Black business participation in the general economy of Dade County and the business activity of the Metropolitan Dade County government were both at a level far below their proportion of the population as a whole.

e. Finally, in the study entitled, "Black-Owned Businesses in Metropolitan Miami,"

statistical data was adduced that in the period between 1972 and 1977 local Black-owned firms did not keep pace with the gains made nationally by Black-owned businesses.

15. In part as a result of the findings and recommendations of these reports, on November 3, 1981, the Dade County Commission, adopted Resolution No. R–1672–81, finding that past discriminatory practices have impaired the competitive position of Black owned and controlled businesses and that Blacks had not proportionately shared in Dade County's economic development. This resolution initiated a policy to promote increased participation of Black-owned businesses in Dade County by developing programs, including specific race conscious measures.

16. The findings and conclusions of Resolution No. R–1672–81 are summarized as follows:

a. There is a statistically significant disparity between the county's Black population and both the number of Black businesses within the County and those receiving county contracts;

b. The gross economic disparity between the Black community and the other communities in Dade County created frustrations in the Black community, which frustrations resulted in the May, 1980 civil disturbances;

c. *Past discriminatory practices* have, to some degree, adversely affected and impaired the competitive position of Black-owned business, resulting in a disproportionately small number of Black businesses in Dade County;

d. The causes of the statistical disparity involved the long-standing existence and maintenance of barriers impairing access by Black businesses to contracting opportunities, and did not relate to the lack of capable and qualified Black enterprises ready and willing to work;

e. Dade county has a compelling interest in stimulating the Black business community, which, on the basis of past experience, is not likely to benefit significantly in the absence of specific measures to increase its participation in county business;

f. Dade county has a compelling interest in promoting a sense of economic equality for all residents of the County; and

g. The Black population must be provided with the opportunity of owning and developing its own businesses.[7]

7. The entire resolution reads as follows:

WHEREAS, it has consistently been the policy of this Board to foster economic growth and business opportunities for its population and to promote the development of local businesses; and

WHEREAS, this Board believes that the favorable economic status and future growth prospects of Dade County are integrally linked to the economic and social conditions of the County's Black communities, residents and businesses; and

WHEREAS, this Board established the Black Business Participation Task Force and charged that Task Force with, among other things, investigating and assessing the present extent of Black business activity within the County generally and specifically in relation to doing business with the County; and

WHEREAS, this Board hereby adopts the findings and conclusions of the Task Force; and

WHEREAS, that Task Force found a statistically significant disparity between the County's Black population and both the number of Black businesses within the County and those receiving County contracts; and

WHEREAS, this finding of the Task Force that Blacks have not proportionately shared in Dade County's economic development is in accordance with the findings and conclusions set forth in Black Owned Businesses in Metropolitan Miami, a Statistical Analysis of U.S. Census Data, prepared by Tony E. Crapp, Sr., Director, Business Development Division, Department of Trade and Commerce Development, City of Miami (December, 1980); An Economic Adjustment Plan for the Civil Disturbance Areas of the City of Miami and Dade County, prepared by Janus Associates (May, 1981); and the Report of the Governor's Dade County Citizens Committee (October 30, 1980); copies of which reports are appended hereto, and the findings and conclusions of which are hereby adopted by this Board; and

WHEREAS, these reports have found that the gross economic disparity between the Black community and the other communities in Dade County has greatly exacerbated the frustrations of the Black community, which frustrations resulted in the May, 1980 riots and loom as sources of continuing racial and ethnic tensions; and

WHEREAS, this Board recognizes the reality that past discriminatory practices have, to

17. The net result of this action was that the commission initiated a policy at the highest level of county government of developing programs and measures to alleviate the problem of lack of participation of Blacks in the county's economic life. This policy was based on reliable, substantial information compiled by independent investigations. Specific race conscious measures were authorized and the county manager was directed to monitor such programs and to present periodic reports to the commission as to their efficacy and viability.

18. The race-conscious policy established by Resolution R–1672–81 was intended to potentially apply to all county contracts negotiated in the future. Specific implementation of this policy would await further action by the commission.

**D.**

19. Metropolitan Dade County government is a multibillion dollar public concern that expends approximately 620 million dollars annually in outside contracting and enters into thousands of contracts with business enterprises both locally and nationally. These contracts range from inexpensive procurement contracts to multimillion dollar Metrorail transit station projects.

20. The Dade County Metrorail system is a billion dollar project financed from federal, state and local funds. A total of forty-five major procurement and construction rail contracts have been awarded since the beginning of the project to September 30, 1982. The total dollar value of the forty-four construction and procurement rail contracts awarded amount to $440,831,-569. By adding to the construction and procurement rail contracts, the Kaisar Transit Group subcontracts, bus facilities contracts, bus design contracts and the downtown component of Metrorail contracts, the total dollar amount expended on the Metrorail system to September 30, 1982 totals $581,358,287.

21. As of August 31, 1982 there were 1600 employees working on the entire Metrorail system. Over half of that workforce (approximately 53%) is comprised of minorities (36% Black, 17% Hispanic). Also, more than 20% of the Metrorail and related construction was being performed by minority contractors and subcontractors, including approximately 7% by Black contractors and subcontractors.

some degree, adversely affected our present economic system and have impaired the competitive position of businesses owned and controlled by Blacks so as to result in this disproportionately small amount of Black businesses; and

WHEREAS, the causes of this disparity are perceived by this Board as involving the long standing existence and maintenance of barriers impairing access by Black enterprises to contracting opportunities and not as relating to the lack of capable and qualified Black enterprises ready and willing to work; and

WHEREAS, Dade County greatly impacts the local economy and business development through its spending of revenue for various County projects and other needs; and

WHEREAS, Dade County has a compelling interest in stimulating the Black business community, a sector of the community sorely in need of economic stimulus but which, on the basis of past experience, is not expected to benefit significantly in the absence of specific measures to increase its participation in County business; and

WHEREAS, this County has a compelling interest in promoting a sense of economic equality for all residents of the County; and

WHEREAS, this Board believes that in order to effectively combat the unemployment and lack of economic participation of the Black community, the Black population must be provided with the opportunity of owning and developing their own businesses,

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

Section 1. This Board hereby adopts the policy of developing programs and measures to alleviate the problem of lack of participation of Blacks in the County's economic life and to stimulate the local Black economy, including specific race conscious measures.

Section 2. Any program or procedure established pursuant to Section 1 above, shall continue until its objectives are met and must maintain sufficient flexibility to be able to achieve its purpose while still remaining viable in terms of the needs of the County to transact its business.

Section 3. The County Manager shall monitor such programs and present periodic reports to the Board as to their efficacy and viability.

22. Twenty stations are presently planned for the Metrorail system. The Earlington Heights station is the last station to be bid and it is located within the Black community of Dade county. This station is classified as contract number N336R. Although it was originally scheduled to be bid as a six station package consisting of the Civic Center, Santa Clara, Allapattah, Overtown, Culmer and Earlington Heights stations, it was later separated out of the package to maximize the opportunity for it to be built by a Black contractor.

23. While the majority of the contracts on the Metrorail were already awarded on a competitive basis, certain actions were taken by county officials following the adoption of Resolution No. R–1672–81 to apply race conscious measures to increase Black participation in the remaining Metrorail construction projects.

a. The County established a committee which became commonly known as the Transit Oversight Committee, which included, *inter alia,* between four and six county commissioners, the county manager and the transportation coordinator. The purpose of this committee was to meet periodically and review suggestions for the inclusion of race-conscious measures within contract specifications of each construction contract.

b. Various administrative orders were issued to increase the participation of Black businesses in county procurement and professional services contracts.

c. The county adopted a $10 million bond guarantee program in early 1982 to assist Black contractors and subcontractors in meeting the bonding requirements on Metrorail contracts.

24. Even before any final decision was made regarding the application of race-conscious measures to the Earlington Heights Station, the county was required by the federal government to adhere to certain minority business enterprise (MBE) participation standards established by the Urban Mass Transportation Administration (UMTA), and minority employment goals set by the United States Department of Labor (Labor). By the time this action commenced, the county's MBE program exceeded both UMTA's minority business enterprise and Labor's minority employment guidelines. In this regard, the county's affirmative action reports establish that more than twenty percent of the Metrorail and related construction was being performed by minority contractors and subcontractors, including approximately seven percent by Black contractors and more than fifty percent of the employees employed in the construction were minorities, including thirty-six percent Black employees.

25. Regulations issued by the U.S. Department of Transportation pursuant to 49 U.S.C. § 1615 mandate that as a condition of federal funding, each Metrorail prime contract must contain provisions insuring that a percentage of each construction contract amount be awarded to minority business enterprises or MBE's. 49 C.F.R. Part 23 contains the following definitions pertinent to this case:

a. "Affirmative action" means taking specific steps to eliminate discrimination and its effects, to ensure nondiscriminatory results and practices in the future, and to involve minority business enterprises fully in contracts and programs funded by the Department.

b. "Joint venture" means an association of two or more businesses to carry out a single business enterprise for profit for which purpose they combine their property, capital, efforts, skills, and knowledge.

c. "Minority" means a person who is a citizen or lawful permanent resident of the United States and who is:

(a) Black (a person having origin in any of the black racial groups of Africa);

(b) Hispanic (a person of Spanish or Portugese culture with origins in Mexico, South or Central America, or the Caribbean Islands, regardless of race);

(c) Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands); or

(d) American Indian and Alaskan Native (a person having origins in any of the original peoples of North America.)

(e) Members of other groups, or other individuals, found to be economically and socially disadvantaged by the Small Business Administration under section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).

d. "minority business enterprise" or "MBE" means a small business concern defined pursuant to section 3 of the Small Business Act and implementing regulations, which is owned and controlled by one or more minorities or women. This definition applies only to financial assistance programs. For the purposes of this part, owned and controlled means a business:

(a) Which is at least 51 per centum owned by one or more minorities or women or, in the case of the publicly owned business at least 51 per centum of the stock which is owned by one or more minorities or women; and

(b) Whose management and daily business operations are controlled by one or more such individuals.

e. "Set-aside" means a technique which limits consideration of bids or proposals to those submitted by MBEs.

26. Federal regulations require that the recipient of funds from the U.S. Department of Transportation set goals that are practical and related to the potential for MBE participation in the funded project. 40 C.F.R. § 23.45(g). For the period commencing with the beginning of the Metrorail System projects and ending September 30, 1982, the county established an MBE participation goal of 16.5% of the total dollar value of all contracts awarded. As of September 30, 1982 the actual MBE participation of 19.6% exceeded that goal.

27. On May 7, 1982, the county manager corresponded with the administrator of UMTA requesting technical advice as to the best contract procedure for assuring substantial minority participation in the contract for the Earlington Heights station. The county manager explained that barriers have existed in the past to contracting opportunities for Black enterprises and that a state of public exigency exists in Dade County which justified affording Black enterprises an opportunity for maximum participation in the Earlington Heights station project. The administrator responded on June 9, 1982 by stating that it was the federal government's intention to allow Dade County maximum local flexibility and decision making authority in the implementation of the county's MBE program. He stated that set-asides may be established when they are not prohibited by state or local law and when a grant recipient determines that they are necessary to meet MBE goals. He further explained that the set-aside may be done where at least three MBE firms with capabilities consistent with contract requirements exist so as to permit competition. Finally, he concluded that, "this authorization permits you to utilize whichever procurement procedure is appropriate to accomplish your goals in light of local conditions, i.e., noncompetitive negotiation, competitive negotiation or formal advertising, provided that the procedure selected is consistent with and does not violate state law or federal requirements relating to use of Federal funds or nondiscrimination."

### E.

28. On July 20, 1982, the county adopted Ordinance No. 82–67. That ordinance required review of *all* proposed county construction contracts to determine whether the addition to bid specifications of race-conscious measures, including bid credits, goals and set-asides would foster participation of Black contractors and subcontractors in the contract work. The ordinance was based on the findings contained in Resolution No. R–1672–81, together with the June, 1982, report of the United States Commission on Civil Rights entitled, "Confronting Racial Isolation in Miami," which was appended thereto, and concluding that Dade County had a compelling interest in stimulating the Black business community. The ordinance directed the county manager to establish an administrative procedure to review each county construction contract to determine whether inclusion of race conscious bid specifications would foster participation of qualified Black contractors, and whether it was feasible to establish a Black

prime contractor set-aside and Black subcontractor participation goals. The ordinance contained several definitions of importance:

a. "Black contractor and subcontractor" means a contracting or subcontracting business entity which is owned and controlled by one or more Blacks and has established a place of business in Dade County.

b. "Owned and controlled" means a business which is at least 51 percentum owned by one or more Blacks, or, in the case of a publicly-owned business, at least 51 percentum of the stock of which is owned by one or more Blacks; and whose management and daily business operations are controlled by one or more such individuals.

c. "Blacks" means a person who is a citizen or lawful permanent resident of the United States and who has origins in any of the Black racial groups of Africa.

d. *Goals* when utilized, goals shall be based on estimates made prior to bid advertisement of the quantity and type of subcontracting opportunities provided by the project to be constructed and on the availability and capability of Black contractors and subcontractors to do such work. When goals are utilized, the invitation for bid and bid documents shall require the apparent lower and qualified bidder prior to bid award to meet the goal or demonstrate that he made every reasonable effort to meet the goal and notwithstanding such effort were [sic] unable to do so. In the alternative, the bid documents may require such demonstration regarding the goal or efforts to meet it to be included by all bidders as part of their bid submission. The steps required to demonstrate every reasonable effort shall be specified in the invitation for bid and the bid documents.

e. *Set-asides.* A set-aside is the designation of a given contract for competition solely among Black contractors. Set-asides may only be utilized where prior to invitation for bid, it is determined that there are sufficient licensed Black contractors to afford effective competition for the contract. In each contract where set-asides are recommended, staff shall submit its recommendation and the basis therefor to the Board for its initial review and determination whether waiver of competitive bidding for such contract is in the best interest of the County.

29. By its terms, the county manager was directed to report to the commission annually on the total dollar amount of county construction contracts and the percentage thereof to be performed by Black contractors. The Black set-aside and goal provisions continue in effect until the commission determines otherwise.[8]

30. At the time it enacted the ordinance, the county commission adopted implementing administrative procedures. The essen-

---

8. The ordinance provides in full:

WHEREAS, this Board has previously made the legislative finding in Resolution No. R–1672–81, adopted November 3, 1981, that Blacks have not proportionately shared in Dade County's economic development and has initiated a policy to promote increased participation of Black-owned businesses in County contracts; and

WHEREAS, such findings and the bases therefor as contained in said Resolution No. R–1672–81, a copy of which is attached hereto, are hereby adopted as the legislative findings on which this Ordinance is based; and

WHEREAS, the above findings are in accordance with the findings and conclusions of the June 1982 report of the United States Commission on Civil Rights entitled, "Confronting Racial Isolation in Miami", a copy of which is appended hereto; and

WHEREAS, the government of Metropolitan Dade County greatly impacts the local economy and business development through its spending of revenue for various County projects and other needs; and

WHEREAS, Dade County has a compelling interest in stimulating the Black business community, a sector of the County sorely in need of economic stimulus but which, on the basis of past experience, is not expected to benefit significantly in the absence of specific race-conscious measures to increase its participation in County contracts,

NOW, THEREFORE, BE IT OBTAINED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

*Section 1.* Article II of Chapter 10 of the Code of Metropolitan Dade County, Florida, is amended by adding the following new section thereto:

**Sec. 10–38.** *Procedure to increase participation of Black contractors and subcontractors in county contracts.*

(a) The foregoing recitations are hereby incorporated and adopted herein and made a part of this Ordinance.

(b) Except where federal or state law or regulations mandate to the contrary, the provisions of this Section shall be applicable to all construction contracts funded in whole or in part by county funds.

(c) (1) "Black contractor and subcontractor" means a contracting or subcontracting business entity which is owned and controlled by one or more Blacks and has established a place of business in Dade County.

(2) "Owned and controlled" means a business which is at least 51 percentum owned by one or more Blacks, or, in the case of a publicly-owned business, at least 51 percentum of the stock of which is owned by one or more Blacks; and whose management and daily business operations are controlled by one or more such individuals.

(3) "Black" means a person who is a citizen or lawful permanent resident of the United States and who has origins in any of the Black racial groups of Africa.

(d) The County Manager shall establish an administrative procedure for the review of each proposed County construction contract to determine whether the inclusion of race-conscious measures in the bid specifications will foster participation of qualified Black contractors and subcontractors in the contract work. Such race-conscious measures may include goals for Black contractor and subcontractor participation and set-asides.

(1) *Goals.* When utilized, goals shall be based on estimates made prior to bid advertisement of the quantity and type of subcontracting opportunities provided by the project to be constructed and on the availability and capability of Black contractors and subcontractors to do such work. When goals are utilized, the invitation for bid and bid documents shall require the apparent lower and qualified bidder prior to bid award to meet the goal or demonstrate that he made every reasonable effort to meet the goal and notwithstanding such effort were unable to do so. In the alternative, the bid documents may require such demonstration regarding the goal or efforts to meet it to be included by all bidders as part of their bid submission. The steps required to demonstrate every reasonable effort shall be specified in the invitation for bid and the bid documents.

(2) *Set-asides.* A set-aside is the designation of a given contract for competition solely among Black contractors. Set-asides may only be utilized where prior to invitation for bid, it is determined that there are sufficient licensed Black contractors to afford effective competition for the contract. In each contract where set-asides are recommended, staff shall submit its recommendation and the basis therefor to the Board for its initial review and determination whether waiver of competitive bidding for such contract is in the best interest of the County."

(e) The County Manager shall annually report to the Board on the total dollar amount of County construction contracts awarded that year and the percentage thereof to be performed by Black contractors and subcontractors. At such time, the Board shall determine whether to continue in effect the administrative procedure for utilization of race-conscious measures authorized by this Ordinance.

*Section 2.* Section 10–34 of the Code of Metropolitan Dade County, Florida, is hereby amended as follows:

Sec. 10–34. Listing of subcontractors not required; exceptions.

Except for contracts for procurement or construction of all or any part of stage I of the rapid transit system, *construction contracts where race-conscious measures have been included in the bid specifications to foster participation of Black contractors or subcontractors,* or where federal or state law or regulations mandate to the contrary, no prime contractor submitting a bid for a project for which bids have been solicited by the legal entities to which this article applies shall be required to list thereon the names of any subcontractors it desires to be employed in connection with the subject project.

*Section 3.* Section 25A–4 of the Code of Metropolitan Dade County, Florida is hereby amended by adding the following paragraph at the end of subparagraph (b) of said section:

For all construction contracts, the trust shall comply with the provisions of Section 10–38 of the County Code and the administrative procedures adopted pursuant to said section.

*Section 4.* Section 32A–1 of the Code of Metropolitan Dade County, Florida, is hereby amended by adding the following after the last sentence of said action:

For all construction contracts, the authority shall comply with the provisions of Section 10–38 of the County Code and the administrative procedures adopted pursuant to said section.

*Section 5.* If any section, subsection, sentence, clause or provision of this ordinance is held invalid, the remainder of this ordinance shall not be affected by such invalidity.

*Section 6.* It is the intention of the Board of County Commissioners, and it is hereby ordained that the provisions of this ordinance shall become and be made a part of the Code of Metropolitan Dade County, Florida. The sections of this ordinance may be renumbered or relettered to accomplish such intention, and the word "ordinance" may be changed to "section", "article", or other appropriate word.

*Section 7.* This ordinance shall become effective ten (10) days after the date of its enactment.

tial provisions of the administrative procedure are summarized as follows:

a. Each department is charged with the responsibility of submitting its recommendations concerning Black set-asides and goals on each construction project under its jurisdiction;

b. A three member contract review committee comprised of county officials is charged with the responsibility of reviewing the Departmental recommendations and submitting a final recommendation on Black set-asides and goals to the county commission for final action;

c. Black subcontractor goals are to be based on "the greatest potential for Black subcontractor participation" and ... "shall relate to the potential availability of Black-owned firms in the required field of expertise.";

d. Availability of Black subcontractors should include "all Black-owned firms with places of business within the Dade County geographic area";

e. Black set-asides shall be considered where there exists at least three Black prime contractors with the capabilities consistent with the contract requirements;

f. A Black prime contractor can be under contract for up to three set-asides within any one year period, but no more than one set-aside at a time;

g. Prior to implementation of a Black set-aside, the county commission is to make findings that the Black set-aside is "in the best interest of the County in order to waive formal bid procedures."; and

h. Bid procedures limiting bids to Black prime contractors would be implemented.[9]

31. On July 21, 1982, pursuant to competitive negotiation procedures, formal pro-

**9.** These regulations provide:

1. DEPARTMENT RESPONSIBILITIES

1.01 All departments (including the Public Health Trust and the Miami-Dade Water and Sewer Authority) with funds budgeted for capital improvement projects are to develop a record keeping system which will include the dollar value of all construction contracts anticipated, a goal for Black participation for the fiscal year, and the dollar value of contracts awarded by minority classification.

1.02 Prior to the completion of contract specifications for each capital project, each department, in conjunction with the consultant project manager, if engaged, will analyze the trades certifications required for each project. After considering the number and types of Black-owned firms likely to be available to participate in the contract, the goals of the department, and a suggestion as to the type of race-conscious measures which could be provided within the contract work are to be developed.

1.03 Suggested actions shall be for (a) establishment of subcontractor goals, (b) set-asides for contractors, (c) bid credit, and (d) no race-conscious requirements.

1.04 Each project is to be submitted to a Contract Review Committee for action and recommendation to the Board of County Commissioners.

2. CONTRACT REVIEW COMMITTEE

2.01 A three (3) member Contract Review Committee comprised of an Assistant County Manager, the Capital Improvements Coordinator and the Affirmative Action Coordinator is created. Staff to the Committee will be provided by a Compliance Office included within the Affirmative Action Division.

2.02 The Committee is to meet monthly or sooner, as necessary, for the purpose of reviewing suggestions for the inclusion of race-conscious measures within contract specifications of each construction project.

2.03 Suggested race-conscious actions are to originate by the County project manager for the construction project and the consultant project manager, if commissioner.

2.04 Projects are to be submitted to the Contract Review Committee prior to preparation of the contract specifications.

2.05 The Contract Review Committee, after considering the number of anticipated subcontractors likely to be employed on the job, will recommend at what point the subcontractors will be listed.

2.06 Following review by the Contract Review Committee, a recommendation is to be submitted to the Board of County Commissioners for action, together with the request for advisement.

2.07 Recommendations for set-aside projects require a waiver of formal competitive bids by the Board of County Commissioners.

3. CERTIFICATION

3.01 All firms participating in the Black Contractors and Subcontractors Program will be certified as Black firms.

3.02 Certification records will be maintained by the Contract Compliance Office within the Dade County Affirmative Action Division.

3.03 Assistance in the certification process will be provided by authorized community-

posals were received and opened for the selection of a prime contractor to construct the county's Metrorail Earlington Heights Station, contract no. N336R. Peter Kiewit Sons' Company, a non-Black prime contractor, tendered the lowest bid of $6,796,520. This low bid was more than two million dollars lower than the next lowest bid of $9,077,316.05, which was submitted by Thacker Construction Co., a Black prime contractor. Thereafter, on August 3, 1982, the county manager informally rejected both bids because: (1) the bids exceeded the county engineer's estimate; [10] and (2) the bidding process had been compromised by public disclosure of the proposed prices submitted and by the two bidders obtaining copies of each others' proposals, thereby rendering it impossible to conclude the bid negotiations under applicable federal regulations. The county manager thereafter proposed to the commission that the re-bid of the Earlington Heights station be subject to the requirements of the recently enacted race-conscious policy set forth in Ordinance No. 82–67 and the administrative procedures enacted pursuant to that ordinance.

.32. In accordance with the administrative procedures now in effect, the contract review committee recommended to the county manager that the commission waive the use of formal competitive bids, and set-aside the Earlington Heights contract for competitive bidding exclusively among certified Black-owned firms along with the inclusion of a fifty percent Black subcontractor participation goal. The committee specifically recommended a set-aside because there were sufficient licensed Black contractors with an established place of business in Dade County possessing the financial and technical capabilities to act as a prime contractor on the project. In addition, a goal of involving Black subcontractors in fifty percent of the dollar value of the contract work was recommended based upon a consideration of the availability of Black subcontractors for each sub-trade item of the contract work and the technical and financial capability of those firms given

based organizations under contract with Dade County.

3.04 Applications for certification will be on standard forms and will include, but will not be limited to, primary business location, evidence of ownership, operation, experience, and the adequacy of the firms.

3.05 Appeals of denials of certification can be made to the Contract Review Committee.

3.06 Certification of all firms will be updated annually.

3.07 Certification of each firm shall be completed prior to the award of any contract under the Black Contractors Program.

3.08 A concentrated, public advertising campaign by trade certification area will be undertaken to encourage certification.

4. SUBCONTRACTOR GOALS

4.01 Percentage goals for the dollar value of subcontractor work are to be considered when the review of the proposed contract indicates the greatest potential for Black subcontractor participation.

4.02 Goals shall relate to the potential availability of Black-owned firms in the required field of expertise.

4.03 Availability should include all Black-owned firms with places of business [that] are within the Dade County geographic area.

4.04 When goals are included with the contract of the prime contractor, bidders shall use good faith efforts to meet the goals.

4.05 Lack of good faith efforts will make the prime contractor's bid ineligible for award and not responsive.

4.06 A prime contractor may include the subpart of the volume of value of a joint venture of a certified subcontractor towards the contract goal.

5. SET-ASIDES

5.01 Contracts for set-asides shall be considered in those contracts when at least three (3) certified prime contractors with the capabilities consistent with the contract requirements exist.

5.02 A prime contractor can be under contract for only one (1) set-aside contract at a time, and no more than three (3) within any one (1) year period.

5.03 Prior to the advertising for set-aside contracts, the Board of County Commissioners is to make findings as to the proposed set-aside contract in the best interest of the County and waiving formal bid procedures.

5.04 Bid procedures limiting competitive bids to Black certified firms will be implemented.

6. BID CREDIT

6.01 Implementation of bid credit will not be done at this time.

10. The county engineer had estimated that the contract should not exceed $6,060,140.

the job size, bonding and working capital requirements.

33. On October 5, 1982, the commission adopted Resolution No. R–1350–82, which accepted the contract review committee's recommendations and mandated that race conscious measures be applied to the Earlington Heights Station. The commission noted that the Earlington Heights Station is the last Metrorail station to be bid and is located in the Black community. The commission specifically found that the:

"... use of both a set aside and a goal on this contract will contribute towards eliminating the marked statistical disparity, noted in this Board's prior legislation, between the percentage of overall Black business participation in county contracts and the percentage of Dade County's population which is Black..."

The resolution found that it was in the best interest of the county to waive formal competitive bidding procedures and authorized setting aside this contract for competition solely among Black-owned prime contractors. The resolution also approved the fifty percent subcontractor goal.[11]

11. The entire resolution reads:

WHEREAS, this Board on November 3, 1981, adopted Resolution No. R–1672–81, finding that Blacks have not proportionately shared in Dade County's economic development and setting forth a policy to promote increased Black business participation in County business; and

WHEREAS, this Board on July 20, 1982, enacted Ordinance No. 82–67 which requires review of proposed county construction contracts to determine whether the addition to bid specifications of race conscious measures will foster participation of Black contractors and subcontractors in the contract work; and

WHEREAS, pursuant thereto the County Manager has created a contract review committee to review each construction contract prior to advertisement and to make recommendations thereon to this Board; and

WHEREAS, the committee has reviewed the Metrorail Earlington Heights Station contract together with the data and suggestions submitted by the Dade County Transportation Administration; and

WHEREAS, the committee has determined that there are sufficient licensed Black general contractors to afford effective competition for the station contract were the contract set aside for competition solely among Black contractors, and based thereon has recommended use of a set-aside on this contract; and

WHEREAS, in addition thereto, the committee has estimated the quantity and type of subcontracting opportunities provided by the contract and the availability and capability of Black contractors and subcontractors to do such work and based thereon has recommended a goal of fifty percent (50%) of the dollar value of the contract to be subcontracted to Black contractors; and

WHEREAS, Earlington Heights is the last of the 20 Metrorail stations to be bid and is located within the Black community of Dade County; and

WHEREAS, increased participation of Black contractors and subcontractors on this contract will have a substantial impact in the community to be served by this station both in terms of the credibility of the County's efforts to involve Black-owned businesses in the economic growth of this County and in terms of greater employment opportunities for members of such community; and

WHEREAS, this Board specifically finds and determines as a matter of fact that the use of both a set aside and a goal on this contract will contribute towards eliminating the marked statistical disparity, noted in this Board's prior legislation, between the percentage of overall Black business participation in County contracts and the percentage of Dade County's population which is Black; and

WHEREAS, this Board further finds that the use of both a set aside and a goal will help to alleviate unemployment and stimulate the Black business community, a sector of Dade County's economy which is sorely in need of economic stimulus, but which on the basis of past experience cannot be expected to receive any significant amount of the public funds to be expended on this contract in the absence of such race conscious measures,

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, that:

1. Resolution No. 4–1672–81 [sic] and Ordinance No. 82–67, together with the findings contained therein, and the documents and reports attached thereto, and the foregoing recitations are hereby incorporated and adopted as the legislative findings of this Board and are made a part of this resolution.

2. The recommendations of the contract review committee are accepted by this Board.

3. This Board finds that it is in the best interests of Dade County to waive formal competitive bidding procedures for the Earlington Heights Metrorail Station contract, and authorizes the set aside of such contract for competition solely among Black contractors, formal bidding being waived in this instance pursuant to Section 4.03(D) of the Home Rule Charter by two-thirds (⅔) vote of the Board members present.

4. In addition to the set aside, a goal of 50% of the dollar value of the contract work for

34. On October 8, 1982, the county issued its advance notice to bidders on the Earlington Heights Station. This notice stated that "Black" means a person who is a citizen or a lawful permanent resident of the United States and who has origins in any of the Black racial groups of Africa. In compliance with the county's recently enacted race-conscious policy, competition was limited to Black prime contractors exclusively. The closing date for submission and the opening of bids on the Earlington Heights project was November 17, 1982.

35. Two bids were received pursuant to the notice but they remained sealed since the Court issued its restraining order before the scheduled time the bids were to be opened and announced.

## F.

36. There is no evidence that the present Metropolitan Dade County government has imposed any racial barriers to Black contractors in obtaining county licenses. To the contrary, county government has a formal equal opportunity services division in its Office of Transportation. This office is charged with meeting federal employment and MBE guidelines on county projects and vigorously seeks to increase minority involvement in county contracting. There is no evidence before the Court that the current Dade County government itself ever engaged in any discriminatory practices against Blacks or any other members of a minority group.

37. Before any race-conscious measures involving Black contractor set-asides and Black subcontractor goals were applied, the county, through the application of federal minority business participation guidelines, had established MBE requirements of forty percent to forty-five percent on the construction of Metrorail stations in Black neighborhoods. While Blacks were represented on the overall Metrorail project in numbers greater than their proportion to the county's population in general, the county desired to make extraordinary efforts to involve Black contractors in the Black subcontractors is adopted on this

completion of the north leg of the system located in large part in the local Black community. The Earlington Heights station became the focal point for applying the race conscious measures established by the county.

38. The race-conscious program established by Ordinance 82–67 and applied to the Earlington Heights station in Resolution No. R–1350–82 was designed expressly to impact Black contractors only. It was not designed to assist members of any other minority group.

39. The ultimate objective of the county's race-conscious program was to remedy the present continuing effects of past racial discrimination and to take affirmative steps to halt the perpetuation of the vicious cycle in which fledgling Black contractors were unable to overcome past discrimination to compete equally with White contractors. The program's specific purpose was to remedy the disabling effects of discrimination that exist in county contracting.

40. For the most part, the various studies and reports that have been introduced into evidence, and that describe the plight of Dade County's Black residents, attribute the low rate of participation of Black-owned businesses, including Black contractors and subcontractors, in contracts awarded by Dade County, to the continuing effects of "societal discrimination"—i.e., lack of capitalization, inadequate housing, poor general education and vocational training, lack of self-esteem, and lack of appropriate role models. The studies and the statistical data that they incorporate do conclusively establish that although more than seventeen percent of Dade County's population is Black, only one percent (or less) of Dade County's construction contracts are performed by Black contractors and subcontractors.

41. Although "societal discrimination" may be the ultimate cause of the extremely low percentage of Black contractors doing business in Dade County, there is evidence in this record from which the Court can

project.

find *identified discrimination* against Dade County Black contractors at some point prior to the county's present affirmative action program. In reaching this conclusion the Court has relied on the following points:

a. The record indicates that less than one percent of Dade County contractors are Black even though the overall Black population exceeds seventeen percent. The only plausible explanation for this statistical disparity is that Black contractors in Dade County continue to suffer from the present effects of past discrimination against them.

b. The construction industry nationally has been particularly slow to open itself to racial minorities.[12] "[R]acial discrimination in the construction trades on racial grounds has been found so often by the courts as to make it a proper subject for judicial notice." *Local Union No. 35 etc. v. City of Hartford,* 625 F.2d 416, 422 (2d Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).[13]

c. The extremely low percentage of county contracts awarded to Blacks in the past.[14] While to a certain extent this is explainable by the low percentage of Black contractors available in the area, to a larger extent, this low percentage is a present effect of past discrimination against Black contractors.

42. Since there are no Black prime contractors in Dade County qualified to perform major county construction projects, the county therefore solicited and recruited major, well-established Black prime contractors from outside Dade County and the State of Florida in order to create a pool of Black prime contractor bidders. In order to fulfill the eligibility requirements to bid on a county contract, each outside contractor had to maintain a place of business in Dade County.[15]

43. The county's race conscious policy has no express expiration date. It appears, however, that it was the intention of its drafters to have the program expire when Black contractors receive county contracts in proportion to their representation in the overall county population.[16]

44. Plaintiff, the general contractors, comprised of White and other non-Black prime contractors, has jointly sponsored with the predominately Black Laborers Union a scholarship and grant program for the members of the Laborers Union and their sons and daughters. Over a fifteen year period, this program financed by contributions from White and other non-Black contractors, resulted in the distribution of more than $700,000.00 in scholarships to predominately Black students and more than $200,000.00 in direct grants to four colleges and universities, including predominately Black Florida A & M University, Bethune-Cookman College and Florida Memorial College.

45. While non-Black businesses could have participated in the Earlington Heights project as part of a joint venture and, in fact one of the bidders appears to be a joint venture, a joint venture would require that the Black-owned firm have at least fifty-one percent control over the project.

46. Plaintiffs did not attempt to formally challenge the county's race conscious policy while it was being developed and prior

12. *Associated General Contractors v. Altshuler,* 490 F.2d 9, 12 (1st Cir.1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

13. Citing *United Steelworkers v. Weber,* 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725, 2725 n. 1, 61 L.Ed.2d 480 (1979). Accord, *Associated General Contractors v. Altshuler,* supra. Even at this date the plaintiff, general contractors, does not have a single Black member (a Black firm had been invited but had not accepted at the time of the final hearing).

14. For the years 1977, 1978, 1979 and 1980, the number of construction contracts awarded to Black contractors was considered "negligible". Testimony of Charles Blowers at 357.

15. Intervenor Thacker Construction Company has established a place of business in Dade County.

16. Ordinance 82–67 provides that the county manager make annual reports to the county commission on the percentage of the total dollar amount of county construction contracts performed by Black contractors. Conceivably, the commission could revise the race conscious program to reflect the latest statistical data available.

to its adoption by the county commission. Protest at any administrative level of the government would have been ineffectual in any event.

47. Requiring that race be taken into account in the award of a contract has an effect on the contract price. Obtaining the contract at the lowest possible dollar amount need not be the exclusive goal of government contracting. Various constraints may effect the final contract price that have nothing whatsoever to do with race.

48. After reviewing all of the evidence presented in the various reports and studies introduced into evidence, the Court expressly finds that the economic condition of the Black community in Dade County is serious. The county manager's description that a state of public exigency exists in Dade County is not unfounded.

### IV.

In accordance with the foregoing findings of fact, the Court makes its conclusions of law:

### A.

■ 1. The Court's first obligation is to examine and decide plaintiffs' pendent claims since a federal court should not decide federal constitutional questions where a dispositive non-constitutional ground is available. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). This admonition is particularly appropriate in this case since it was recently held in another case similar to this one that the court there abused its discretion by reaching the federal constitutional issue where a state law claim was dispositive of the case. See *Schmidt v. Oakland Unified School District,* 662 F.2d 550 (9th Cir.1981); *vacated and remanded,* —— U.S. ——, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982). Accordingly, the Court turns first to Plaintiffs' two pendent claims contained in the complaint. Taking them in

the reverse order in which they are presented, the complaint alleges that the county violated its own competitive bid procedure mandated by local law when it enacted its race-conscious policy. Additionally, the complaint alleges that the county's race-conscious policy violated the plaintiffs' rights under the Florida Constitution. It is the opinion of the Court that the pendent claims are not dispositive of the federal constitutional issues presented by this case.

### (1)

■ 2. The plaintiffs contend that the county's waiver of formal competitive bidding procedures on the ground that the waiver is in the best interests of Dade County violates the Dade County Home Rule Charter [17]. Section 4.03(D) of the Dade County Home Rule Charter provides:

Contracts for public improvements and purchases of supplies, materials, and services other than professional shall be made *whenever practical* on the basis of specifications and competitive bids. Formal sealed bids shall be secured for all such contracts and purchases when the transaction involves more than the minimum amount established by the Board of County Commissioners by ordinance. The transaction shall be evidenced by written contract submitted and approved by the Board. The Board, upon written recommendation of the Manager, *may by resolution adopted by two thirds vote of the members present, waive competitive bidding when it finds this to be in the best interest of the county.* (emphasis added)

3. It is apparent from the plain language contained in § 4.03(D) that the county has the necessary discretion to waive the competitive bidding requirements upon a two thirds vote of the members present. This was done in this case. In Florida, the general rule is that "a public body has wide discretion in soliciting and accepting bids

---

**17.** The Florida Constitution grants special home rule powers to Metropolitan Dade County. See Fla.Const. Art. VIII § 6 (1968). Pursuant to that constitutional provision, the elector-

ate of Dade County adopted a Home Rule Charter which contains special municipal powers not normally available to county government.

for public improvements and its decision, when based on an honest exercise of this discretion, will not be overturned by a court even if it may appear erroneous and even if reasonable persons may disagree." *Liberty County v. Baxter's Asphalt and Concrete, Inc.,* 421 So.2d 505 (Fla.1982). The county determined to waive competitive bid procedures and to apply race-conscious criteria in order to eliminate the disparity in the number of county contracts received by Black-owned businesses. Based upon the findings contained in the enacting ordinance and resolution and confirmed in the findings made by this Court, the waiver was clearly within the discretion of the county. Accordingly, plaintiff's contention otherwise is without merit.[18]

### (2)

4. Plaintiffs second pendent claim parallels their federal constitutional claim since the Florida courts have held that the equal protection and due process provisions of the Florida Constitution confer the same guarantees and impose the same standards as the equivalent provisions of the United States Constitution. See *Florida Real Estate Commission v. McGregor,* 336 So.2d 1156 (Fla.1976) and *Florida Canners Association v. Department of Citrus,* 371 So.2d 503, 513 (Fla. 2d DCA 1979), *affirmed,* 406 So.2d 1079 (Fla.1982). Accordingly, resolution of this issue is entirely dependent upon the outcome of plaintiffs' federal claim and will be controlled by the Court's decision in part IV-B of this opinion.[19]

### B.

5. At least since 1954 when the Supreme Court issued *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the elimination of all vestiges of racial discrimination in our society has been a recognized goal of all branches and levels of government in the United States. While the removal of purposeful discrimination has largely been accomplished, the struggle to achieve complete equality has not yet been realized. Government therefore has sought to advance equality in American society by using affirmative action programs which employ racial classifications and numerical goals or quotas in the distribution of benefits and opportunities. Constitutional problems arise when courts are compelled to gauge the extent to which government may go in applying affirmative action plans to rectify the present effects of past discrimination. Although the Supreme Court has issued a trilogy of cases in recent

---

**18.** Plaintiffs also claim that Chapter 11A of the Code of Metropolitan Dade County expressly prohibits the County from enacting race-conscious remedies. Chapter 11A by its terms relates only to the areas of employment and housing and, therefore, is inapplicable to the subject ordinance and resolution which fosters Black business participation in county construction contracts. Plaintiffs additionally argue that Section 11A–22(h) of the County Code prohibits affirmative action programs like the program in the instant case. Section 11A–22(h) reads:

"(h) Nothing contained in this article shall ... require any employer ... to grant preferential treatment ... on account of an imbalance which may exist with respect to the total number or percentage of persons of any race ... employed by any employer ... in comparison with the total number or percentage of persons of such race ... in any community ...."

This section is taken verbatim from § 703(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(j). In *International Brotherhood of Teamsters v. United States,* 431 U.S.

324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the employer argued that statistics which compare the racial composition of an employer's work force to the composition of the population are prohibited by Section 703(j). The Supreme Court expressly rejected this argument holding:

Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population." *Id.* 431 U.S., at 339, n. 20, 97 S.Ct. at 1856–57.

Accordingly, the Court concludes that Chapter 11A is inapposite and that Section 11A–22(h) does not preclude consideration of population characteristics in determining discrimination.

**19.** In light of the Court's ruling that the set-aside is impermissible under the Federal Constitution while the goals provision is acceptable, the Court also concludes that the same result would follow under the Florida Constitution.

years on this issue,[20] no clear guidance has emerged in this tangled area of the law. Until some definitive resolution of the reverse discrimination dilemma is forthcoming, the legal and scholarly debate will continue.[21]

(1)

6. In this case, the plaintiffs are challenging the legality of a system of race-conscious ordinances, resolutions and procedures which permit the county to set-aside a construction contract for competition exclusively among Black contractors and to establish Black subcontractor goals on county construction contracts. It is the position of the plaintiffs that the county is prohibited by the Fourteenth Amendment from applying its race-conscious procedures to the Earlington Heights contract in such a way that plaintiffs are barred or otherwise restricted from bidding on the contract solely because of their race.

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." The equal protection clause means essentially that while the state may of ne-

cessity, classify people and activities in order to promote the general welfare, those persons and activities which are similarly situated must be similarly treated by law.[22] Neither a state nor one of its subdivisions [23] may employ a racial classification in the imposition of rights and responsibilities on its residents or in the distribution of benefits without inviting scrutiny by the courts as to the constitutionality of these classifications. Two recent notable cases out of the Supreme Court provide some guidance in resolving the important issue of whether the application of a benign racial classification is justified in this instance.

7. The constitutionality of a state's affirmative action plan mandating preferences on the basis of racial or ethnic origin was first addressed by the U.S. Supreme Court in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).[24] The challenge was to an admissions program adopted by the medical school of the University of California at Davis. Under that program, sixteen of the one hundred places were specifically reserved for minority applicants. Bakke, a

---

**20.** *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); and *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

**21.** A number of law review articles have been published since *Bakke* that discuss the reverse discrimination dilemma and affirmative action plans: Van Benthuysen, Minority Business Enterprise Set-Aside: The Reverse Discrimination Challenge, 45 Alb.L.Rev. 1139 (1981); Bohrer, Bakke, Weber and Fullilove: Benign Discrimination and Congressional Power To Enforce the Fourteenth Amendment, 56 Ind.L.J. 473 (1981). Richards, Equal Protection and Racial Quotas: Where does *Fullilove v. Klutznick* Leave Us?, 33 Baylor L.Rev. 601 (1981). The Constitutionality of Affirmative Action in Public Employment: Judicial Deference to Certain Politically Responsible Bodies, 67 Va.L.Rev. 1235 (1981). Choper, The Constitutionality of Affirmative Action, Views from the Supreme Court, 70 Ky. L.J. 1 (1981–82); Belton, Discrimination and Affirmative Action, 59 N.C.L.Rev. 531 (1981); Lavinsky, Affirmative Action Trilogy and Benign Racial Classifications—Evolving Law in Need of Standards, 27 Wayne L.Rev. 1 (1980); Baldwin and Nagan, Board of Regents v.

Bakke: The All-American Dilemma Revisited, 30 U.Fla.L.Rev. (1978); Fullilove And The Minority Set-Aside: In Search of An Affirmative Action Rationale, 29 Emory L.J. 1127 (1980).

**22.** *F.S. Rogster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920); G. Gunther, Constitutional Law Cases and Materials 678 (10th ed. 1980); J. Nowak, R. Rotunda, V.J. Young, Constitutional Law (1978); Van Benthysen, Minority Business Enterprise Set-Aside: The Reverse Discrimination Challenge, 45 Alb.L.Rev. 1139, 1142 (1981).

**23.** Counties and county officers are instrumentalities of state power for purposes of the equal protection clause. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Small v. Hudson,* 322 F.Supp. 519 (M.D.Fla. 1971). Accord, *Avery v. Midland County,* Tex., 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

**24.** This opinion has been the subject of a number of law review comments. See 32 Ark.L. Rev. 499 (1978); 92 Harv.L.Rev. 131 (1978); 32 Oklahoma Law Rev. 119 (1979); 54 Washington Law Rev. 373 (1979); 58 Or.L.Rev. 311 (1979).

white male whose application had been rejected, alleged that he would have been accepted but for the Davis affirmative action plan. He argued that the school had violated Title VI of the Civil Rights Act of 1964 [25] and the equal protection clause of the Fourteenth Amendment.

Five Justices, concluding that an action violates Title VI only if a similar state action would violate equal protection, reached the constitutional question. See *Bakke*, 438 U.S. at 287, 98 S.Ct. at 2746 (Powell, J.), 328, 355, 98 S.Ct. 2767, 2781 (Brennan, White, Marshall, Blackmun, JJ.). As to the equal protection question, Justice Powell expressed the view that all racial classifications which exclude individuals from the enjoyment of some opportunity, including those classifications operating in favor of minorities, call for strict scrutiny. Applying that standard, he concluded that a state university has a compelling interest in attracting a diverse student body, but that the strict racial quota imposed by the Davis plan was not necessary to the achievement of that goal. He held, therefore, that the Davis program violated equal protection. Justice Powell then stated, however, that in his view race may be considered as one factor in an admissions program aimed at achieving student diversity.

Justices Brennan, White, Marshall, and Blackmun joined in an opinion concurring and dissenting. On the equal protection question, they would have held that racial classifications designed to further remedial purposes were subject only to an intermediate level of scrutiny; i.e., the classification must be substantially related to an important governmental interest. They found the Davis plan substantially related to the important state interest in remedying the effects of past societal discrimination and, therefore, constitutional.[26]

Justice Stevens, concurring and dissenting, was joined by the Chief Justice and by Justices Stewart and Rehnquist. The opinion by Justice Stevens concluded that the Davis plan violated Title VI, and did not reach the equal protection issue.

Thus, a majority of five Justices held that a state university admissions program may not employ strict racial quotas, one of the five reaching that decision on constitutional grounds and the other four on statutory grounds. A separate majority of five Justices, however, held that a state university admissions program may take race into account as one factor.[27]

8. In 1980 the Supreme Court revisted this issue in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980),[28] where the Court addressed the constitutionality of the minority business enterprise provision of the Public Works Employment Act of 1977.[29] 42 U.S.C. § 6705(f)(2). Un-

---

**25.** This provision states:
> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The applicability of this statute is not an issue in this case.

**26.** This opinion did not articulate a precise test by which lower courts could be guided in the application of this intermediate level of scrutiny. These four justices approved both the Davis 16% quota in *Bakke* and the Congressional 10% set-aside in *Fullilove.* They found that both affirmative action plans were constitutionally acceptable.

**27.** The Court is indebted to Judge Fletcher of the Ninth Circuit for her succinct summaries of *Bakke* and *Fullilove* in *Schmidt v. Oakland Unified School District,* 662 F.2d 550 (9th Cir.

1981). Since Judge Fletcher's terse summaries of these important cases cannot easily be improved, they have been adopted with some modification for use in this opinion.

**28.** Like the *Bakke* opinion, *Fullilove* has attracted considerable attention in the law reviews. A number of case comments have been written about it: e.g. 94 Harv.L.Rev. 125 (1980); 15 Suffolk U.Law.J. 306 (1981); 60 N.C.L.Rev. 681 (1982); 38 Wash. & Lee L.Rev. 1315 (1981).

**29.** The legality of an all-private (no governmental entity was involved), voluntary, race-conscious affirmative action plan was discussed in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Court held that an affirmative action plan that was collectively bargained by an employer and a union and that reserved for Black employees 50 percent of the openings in an inplant

der that provision, no federal grant for a local public works project may be made without assurance by the applicant that at least ten percent of the amount of the grant will be expended for minority business enterprises or MBE's. The implementing regulations made clear the administrative understanding that a waiver or partial waiver is justified to avoid subcontracting with an MBE at an unreasonable price, i.e., a price above competitive levels which cannot be attributed to the minority firm's attempt to cover costs inflated by the present effects of disadvantage or discrimination. An aggrieved white contractor argued that the statutory provision violated equal protection.

The Chief Justice, in an opinion joined by Justices White and Powell, found the plan constitutional and approved the act. The plurality opinion concluded that Congress acted within its competence in seeking ways to end procurement practices that can perpetuate the effects of prior discrimination.

Although the Chief Justice emphasized that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees," 448 U.S. at 491, 100 S.Ct. at 2781, he considered several factors that tipped the balance in favor of the statute's constitutionality:

a. The statute was enacted by the Congress, a co-equal branch of government, as a remedial measure with the objective of directing funds into the minority business community.

b. Congress had before it abundant evidence from which it could conclude that this remedial measure was necessary to eliminate the effects of prior discrimination that

traditional government procurement practices tended to perpetuate.

c. The MBE plan envisioned by the statute allowed administrative waivers and exemptions that would absolve a grantee from compliance with the plan after making a good faith effort to achieve its objectives.

While the Chief Justice warned that the MBE statute "press[ed] the outer limits of Congressional authority," 448 U.S. at 490, 100 S.Ct. at 2781, he concluded that it passed constitutional muster since it provided a reasonable assurance that application of racial or ethnic criteria would be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively.

9. While the plurality opinion did not explicitly state what standard of review should be applied to benign racial or ethnic classifications,[30] Justice Powell wrote a concurring opinion in which he repeated his belief, first expressed in *Bakke,* that the strict scrutiny standard should be applied.

Justice Powell believes that a classification is constitutionally prohibited unless it is a necessary means of advancing a compelling governmental interest. To impose a race-conscious remedy, two requirements must be met. First, the particular governmental body involved must have the authority (and capability) to act in response to *identified discrimination.* Second, the governmental body must make findings that demonstrate the existence of illegal discrimination. *Fullilove, supra* 448 U.S. at 498, 100 S.Ct. 2785 (Powell, J., concurring). The third part of the Powell test provides that the *means* selected by the governmental body be narrowly drawn to fulfill the purpose of the remedial measures taken.

craft training program until the percentage of Black craft workers in the plant was commensurate with the percentage of Blacks in the local labor force did not violate Title VI of the Civil Rights Act of 1964. No constitutional issues were implicated by the decision since the plan reviewed there did not involve state action and therefore the principles developed in that case have minimal significance to the issues raised in our case.

30. Benign discrimination means discrimination on the basis of race which is designed to benefit members of supposedly disadvantaged minority groups. It usually results in some degree of disentitlement for the nonpreferred members of the majority White race. G. Guntler, Constitutional Law Cases v. Materials, 678 (10th ed. 1980) [quoted in 45 Alb.L.J. at 1149–50].

Justice Powell maintains that there is a compelling governmental interest in eradicating the continuing effects of past discrimination. However, even a benign racial classification must be responsive to *identified discrimination,* that is, a more focused attempt to remedy the effects of past discrimination in one particular group or industry, not society at large. Justice Powell was quite clear that the general interest of remedying past *societal* discrimination could not justify the use of race-conscious measures.[31] Finally, once the governmental body proffers a compelling interest to support its reliance upon a racial classification, it must select a remedy narrowly drawn to fulfill its purpose. To survive strict judicial scrutiny, a race-conscious classification must be measured by this standard.

In reviewing the propriety of a race-conscious remedy, Justice Powell listed and approved several factors previously considered by the lower courts in making their determinations:

(i) *the efficacy of alternative remedies, NAACP v. Allen,* 493 F.2d 614, 619 (CA5 1974); *Vulcan Society v. Civil Service Comm'n,* 490 F.2d 387, 398 (CA2 1973); (ii) *the planned duration of the remedy. Vulcan Society Inc. v. Civil Service Comm'n,* 490 F.2d at 399; *United States v. Wood, Wife [Wire], & Metal Lathers Local 46,* 471 F.2d 408, 414, n. 12 (CA2), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973), (iii) *the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, Association Against Discrimination v. Bridge-*

*port,* 594 F.2d 306, 311 (CA2 1979); *Boston Chapter NAACP v. Beecher,* 504 F.2d 1017, 1026–1027 (CA1 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n* 482 F.2d 1333, 1341 (CA2 1972), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Carter v. Gallagher,* 452 F.2d 315, 331 (CA8) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), and (iv) *the availability of waiver provisions if the hiring plan could not be met, Associated General Contractors Inc. v. Altshuler,* 490 F.2d 9, 18–19 (CA1 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) (emphasis added) Ibid. 448 U.S. at 510–11, 100 S.Ct. at 2791.

A fifth factor was added by Justice Powell: the effect of the set-aside upon innocent third parties. 448 U.S. at 514, 100 S.Ct. at 2793.

10. After the Supreme Court decisions of Fullilove and Bakke,[32] some federal and state courts have applied the strict scrutiny standard in determining the constitutionality of race-conscious remedies. See e.g. *Morgan v. O'Bryant,* 671 F.2d 23 (1st Cir. 1982) (applying strict scrutiny to uphold an affirmative action plan by a local school board directing teacher layoffs in such a way as to maintain the current percentage of black teachers and administrators); *M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D. Tenn.1981) (employing strict scrutiny in affirming MBE regulations promulgated by the U.S. Department of Transportation); *Perini Corporation et al. v. Massachusetts Bay Transportation Authority, et al.,* No. 77–2340–MC (D.Mass.1980) (using the strict

---

**31.** Justice Powell expanded on this thought in *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 where he said:

The State certainly has a legitimate and substantial interest in ameliorating or eliminating where feasible, the disabling effects of identified discrimination .... That goal was far more focused than the remedying of the effect of "societal discrimination," an amorphous concept of injury that may be ageless in its reach into the past.

**32.** Even before the *Fullilove* decision, the federal district courts applied the strict scrutiny

standard in those cases which first challenged the 10% MBE set-aside of the PWEA enacted by Congress. See e.g. *Constructors Assoc. of Western PA. v. Kreps,* 441 F.Supp. 936 (W.D. Penn.1977); affirmed 573 F.2d 811 (3rd Cir. 1978); *Ohio Contractors Ass'n v. Economic Development,* 452 F.Supp. 1013 (S.D.Ohio 1977; affirmed 580 F.2d 213 (6th Cir.1978); *Carolinas Branch, Associated, Etc. v. Kreps,* 442 F.Supp. 392 (D. South Carolina 1977); *Fullilove v. Kreps,* 443 F.Supp. 253 (S.D.N.Y.1977), affirmed, 584 F.2d 600 (2d Cir.1978).

scrutiny standard to conclude that the defendants had not made the requisite findings of illegal discrimination); *Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629 (M.D.Ala.1980) (applying strict scrutiny to invalidate MBE set-aside regulations promulgated by the U.S. Department of Transportation); *Arrington v. Associated General Contractors,* 403 So.2d 893 (Ala.1981); *cert. denied,* 455 U.S. 913, 102 S.Ct. 1265, 71 S.Ct. 453 (1982) (utilizing the strict scrutiny standard to invalidate a municipal ordinance establishing an MBE requirement for city contracts on the grounds, *inter alia,* that the race-conscious remedy was not sufficiently narrow to comport with equal protection guarantees).

Other courts have refrained from adopting any express standard of scrutiny. See e.g. *Schmidt v. Oakland Unified School District,* 662 F.2d 550 (9th Cir.1981), *vacated and remanded on other grounds,* —— U.S. ——, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982) (upholding the constitutionality of a plan requiring a general contractor bidding on a school construction project to use minority owned businesses for at least 25% of the dollar amount of the total bid); *Local Union No. 35 etc. v. City of Hartford,* 625 F.2d 416 (2d Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) (validating a municipal ordinance containing an affirmative action plan requiring a good faith effort to achieve at least a 15% level of minority and female employment); *Pettinaro Const. Co., Inc. v. Delaware Authority, etc.,* 500 F.Supp. 559 (D.Del., 1980) (applying "stringent standards" to deny a motion for summary judgment of plaintiff-contractor who was challenging a 15% minority set-aside goal).

■ 11. Since the Supreme Court has not expressed a majority view on what level of scrutiny must be applied to preferential racial quotas or numerical goals for minori-

ties disadvantaged by the present effects of past discrimination, lower courts retain the authority to appropriately examine affirmative action programs involving benign discrimination. It appears however that there is an evolving doctrine gradually developing in the federal courts that benign racial or ethnic classifications are subject to strict judicial scrutiny and may only be employed when necessary to accomplish a compelling governmental interest.

As our society gradually emerges from the dark shadows of past unequal treatment into the sunshine of true equality of opportunity regardless of race, the justification for affirmative action and the discrimination that necessarily results from affirmative action will disappear. While that point has not yet been reached, substantial progress has been made. As this nation strives towards its ultimate goal of racial equality, the courts must be increasingly vigilant of the remedies employed to reach that goal. The need for strict judicial scrutiny will increase, not lessen since the justification for benign racial classifications will eventually disappear. Accordingly, it is the judgment of this court that in order to prevail, the county's race-conscious policy must pass the test of strict scrutiny. If it fails to measure up to this exacting standard, it cannot be permitted to continue.[33]

(2)

12. Plaintiffs attack the county's race-conscious program on three fronts: (a) by questioning the county's competence to make findings in the area of race discrimination; (b) by challenging the adequacy of the record upon which the county made its findings of discrimination; and (c) by asserting that the race-conscious remedy imposed by the county is not carefully tailored to rectify the continuing effects of past unlawful discrimination.[34] The first two points can be disposed of without extended

---

**33.** As explained in part III–B(2) of this opinion, the set-aside fails under the strict scrutiny standard. The Court refrains from deciding whether the set-aside would pass constitutional muster under any lesser standard. The goals provision, of course, would be sustained under any lesser standard of scrutiny.

**34.** The last contention is really one of the requisites of the strict scrutiny standard, See part iii, post.

discussion. The third contention, however, will require extensive analysis.

(i)

■ Plaintiffs initially contend that the county commission has neither the authority nor the competence to make factual and legal determinations in the area of race discrimination. This argument is without merit since the county clearly has the authority to make the findings upon which its race-conscious policy was based.

Dade County is authorized by its Home Rule Charter, among other things, to:

> a. Conduct studies of county population, ... facilities, resources, and needs and other factors which influence the county's development, and on the basis of such studies prepare such ... reports ... for the ... economic ... development of the county. Section 4.07.
>
> b. Make investigations of county affairs, inquire into the conduct, accounts, records, and transactions of any department or office of the county, and for these purposes require reports .... Section 1.01A(20).
>
> c. Prepare and enforce comprehensive plans for the development of the county. Section 1.01A(5).
>
> d. Use public funds for the purposes of promoting the development of the county ...." Section 1.01A(15).
>
> e. Provide and operate ... public transportation systems." Section 1.01A(2).
>
> f. Adopt such ordinances and resolutions as may be required in the exercise of its powers ...." Section 1.01A(22).
>
> g. Perform any other acts consistent with law which are required by this Charter or which are in the common interest of the people of the county." Section 1.01A(23).

A county commission functions as a legislative body in making county policy and enacting local law.[35] Justice Powell's concern, expressed in *Bakke,* 438 U.S. at 309, 98 S.Ct. at 2758, that "isolated segments of our vast governmental structures are not competent to make ... decisions ... [involving the imposition of race-conscious remedies]," should not deter this Court from accepting the findings made by the county commission. Justice Powell was speaking about subordinate, mostly administrative bodies, that do not possess law-making powers, for example, a state university.[36] Here, the county commission is the duly elected legislative body of local government. Consequently, the Court concludes that the commission had the competence and the authority to determine that Blacks have not shared proportionately in the county's economic development, as well as the ability to enact a race-conscious program to remedy this situation.

(ii)

■ 14. Plaintiffs next argue that the commission did not compile the necessary record that would justify the need for a race-conscious ordinance. At the time it enacted Ordinance 82–67 and Resolution R–1350–82, the commission had available to it various reports and studies described previously in this Court's findings of fact.

Contrary to Plaintiffs' contention, the information contained in these reports do provide a substantial basis for the actions taken by the county commission, including the implementation of race-conscious measures and the Court made a finding to this effect.[37] Indeed, plaintiffs do not even suggest what additional better information the commission could have relied on in making its findings that Blacks have not proportionately shared in the county's economic development.

(iii)

15. Thus far the Court has ruled that the county commission had the authority to

---

**35.** In Florida, county governments are granted a number of powers and duties by the State. See Fla.Stat.Ann. § 125.01 (West Supp.1982) Dade County's Home Rule Charter, Fla.Const. Art. VIII § 6, gives the county commission of this county even greater powers not normally available under general law.

**36.** The defendants in *Bakke* were, of course, the Regents of the University of California, an administrative agency without any legislative expertise.

**37.** See Finding of Fact No. 17.

act in response to identified discrimination and that it had an adequate record upon which to make findings that demonstrate the existence of identified discrimination. The next critical inquiry is whether the county's race-conscious program is a constitutionally appropriate means of serving the compelling governmental interest of remedying the present effects of past identified discrimination. Consequently, the central issue for decision by the Court is whether the *means* employed by the county was carefully tailored for that purpose.

16. As already stated, the means test proposes an evaluation of the following factors:

a) efficacy of alternative remedies, i.e. are there less intrusive means which might serve the compelling state interest;

b) the planned duration of the remedy;

c) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force, i.e. is there a reasonable relationship between the minority workers to be hired to the percentage of minority group members in the relevant population;

d) the availability of waiver provisions; and

e) the effect of the set aside on innocent third parties.

In order to determine whether the county's race-conscious program passes constitutional scrutiny, the two principal parts of the program must be examined separately:

■ 17. THE SET–ASIDE. The set-aside provision of Ordinance 82–67 restricts competition in a given contract solely among Black contractors. It contains two limiting provisions, however, in its application. First, it may only be used when the county commission has determined it to be "in the best interest of the county." Next, it may only be used where it has been previously administratively determined that there are sufficient licensed Black contractors to afford effective competition for the

contract. Ordinance 82–67 does not, of itself, set-aside any contract. It simply defines what race-conscious procedures will be employed if and when it has been determined that a contract should be set-aside. Resolution R–1350–82 actually set-aside the Earlington Heights station contract for competition exclusively among Black prime contractors.

The set-aside has several important consequences. First and most obviously, it excludes every potential prime contractor from even submitting a bid on the Earlington Heights contract unless the contractor happens to be Black-owned.[38] It is more than race-conscious, *it is race exclusive.* Second, it assumes that there are sufficient Black prime contractors to make an effective bid, even if the county has to encourage contractors from other areas of the country to participate. Finally, the set-aside marks an unusual departure from the settled principles of competitive bidding that is the distinguishing characteristic of government contracting. See e.g., 41 U.S. C.A. §§ 252, 253, Fla.Stat.Ann. § 255.29; Dade County Home Rule Charter, § 4.03(D).

18. In order to determine whether the county's set-aside is a constitutionally appropriate means of serving the compelling interest of redressing the effects of past discrimination, the set-aside remedy must be carefully tailored to achieve that objective in a manner reasonably related to the desired end of removing the continuing effects of past discrimination against Black contractors in Dade County. Measured against this standard the county's set-aside is clearly impermissible. Indeed, the question is not even close. The set-aside fails all five of the factors employed by the means test.

19. First, there are substantially less intrusive remedies available to the county for increasing Black contractor participation in the Metrorail system without totally excluding White contractors from a substan-

**38.** Non-Black contractors can participate as part of a joint venture with a Black contractor. This apparently was done in the case of one of the bidders to this contract.

tial benefit to which they would otherwise be entitled. For instance, the MBE goals already targeted by the county in accordance with federal regulations provide an excellent vehicle for involving greater minority participation in the overall project. In fact, as of September 30, 1982 the actual MBE participation of 19.6% exceeded the MBE goal of 16.5%. While the Court recognizes that this MBE goal includes other minorities in addition to Blacks, some 7% of the Metrorail contracts have in fact gone to Black contractors. How far local government can go in setting goals for minority participation will be discussed shortly, but a goal-oriented remedy of some sort is certainly less intrusive than an exclusive set-aside for Black contractors.

There are other positive proposals available to the county that may increase Black participation by making Black-owned firms more competitive in the bidding process itself, without excluding others from that process. The county may assist the Black contractor in preparing his bid and informing him of the intricacies of the government procurement process. The county has established a bond guarantee program for assisting Black contractors in meeting the bonding requirements for participation in county contracts. The county has affirmatively contacted Black businesses in an effort to make them aware of their eligibility and to involve them in county contracting.[39] In short, there are alternative remedies available to the county, some of which are now in effect, that are designed to meet the county's objective without imposing an exclusive set-aside that disadvantages others solely on the basis of race.

20. Second, while the Earlington Heights Station is a specifically designated set-aside, the underlying ordinance upon which the set-aside is based, 82–67, has no specific time limit. It is applicable to all future county contracts whether Metrorail or not. The county's representation that its race-conscious program would self-destruct by its own terms if and when Black contractors ever receive county contracts in proportion to their representation in the overall population is at best indefinite and provides no firm guidance as to when this program will expire. Even though the Court is inclined to agree that the commission intended that the program terminate at that point, there is nothing in this record from which the Court could infer that there will ever be enough Black contractors in this county to participate to that extent. Unlike the Congressional set-aside approved in *Fullilove,* the county's set-aside appears designed to be a permanent part of its contracting requirements. Its permanent nature is in sharp contrast with the PWEA set-aside. That act was intended as a *short-term* measure to alleviate the problem of national employment and to stimulate the national economy. *Fullilove,* supra, 448 U.S. at 456–57, 100 S.Ct. at 2763–2764. The duration of the set-aside was not conditioned upon meeting any fixed percentage such as 10% (the percentage of the set-aside) or 17% (the percentage of minority group members in the nation). The act provided by its own terms that federal monies be committed to state and local grantees by September 30, 1977. 42 U.S. C.A. § 6707(h)(1). There is no equivalent section in Ordinance 82–67.

21. The next consideration is whether there is a reasonable relationship between the 100% set aside and the percentage of Blacks in the local population, i.e. 17%. Justice Powell in *Fullilove* approved the 10% set aside finding that it was roughly

---

**39.** Certainly, the county should be encouraged to seek out local qualified Black contractors and take positive action to make them more competitive. Whether the county's objective of improving the local Black business climate is fostered by soliciting bids from out-of-state Black owned firms is another matter. The county has failed to articulate a rational basis for the proposition that an outside Black prime contractor will have a more positive impact on Black-owned businesses in Dade County than would a local White-owned contractor who aggressively seeks to employ Black subcontractors in the project. While awarding the prime contract for the Earlington Heights station to an outside Black prime contractor may be symbolic (and that may be a legitimate consideration for a local political body), it would not seem to involve any tangible benefits per se for the local Black business community.

halfway between the percentage of minority contractors and the percentage of minority group members in the nation. In the instant case, however, the 100% set aside far exceeds the percentage of Blacks in the local population.

The county urges the Court to view the set-aside in the context of overall county contracting and not just one Metrorail project. Over a ten year period, it is contended, the county will expend approximately 6.5 billion dollars on all its contracts. When the 40 million dollars worth of Metrorail contracts allocated on a race-conscious basis is compared to the total expenditure of 6.5 billion, it amounts to approximately .6% of all contracts set-aside for Blacks. Instead of 100% of one contract set-aside for Blacks, the county suggests that the Court should view this from the perspective of a .6% set-aside, a much more acceptable percentage when examined in the context of total county contracting over a ten year period.

Although this is a novel perspective to view the set-aside, it is an incorrect one. Any theory which purports to give complete benefits to members of one race under the guise of a "totality" theory is fallacious. In the first place we have no "totality" of contracts before the Court. What we have is a single contract for the construction of the Earlington Heights Metrorail Station. It is the county's procedure of setting aside *that* contract that is at issue here, not the county's potential ten year plan involving thousands of contracts. What the county may do in the future is entirely speculative. It may set-aside .6% of all future contracts or it may immediately set-aside 17% of all future contracts until Black contractors share the requisite proportion of all county contracting.[40] It is the propriety of the 100% set-aside of the Earlington Heights station that is for the determination of the Court. Nothing else.

Furthermore, every exclusive set-aside could be justified if it was placed in a larger context. Each set-aside must be evaluated on its own merits and under the particular conditions in which it developed. It therefore cannot be considered in the totality of county procurement.[41]

22. Turning to the next aspect of the means test, we find that the county's set-aside contains no waiver provision. While the set-aside is conditioned on the availability of responsible Black prime contractors;

---

**40.** The county manager testified on that point:

Q. Mr. Stierheim, listening to your counsel's last question, are you saying that your object here is to award $100,000,000 out of $600,000,000 this year to black contractors?

A. I don't think that is something achievable overnight. I think it is a worthy goal for this community over the next twenty, thirty years, and the quicker we get to it, I think the better off we will be.

Q. Over the next twenty or thirty years, you feel that 17 percent would be an attainable goal. Is that correct?

A. I can't give you a year figure. That is impossible.

Q. I am trying to know what is your figure for this year, Mr. Stierheim.

A. Progress.

**41.** The county's reliance on *J.H. Rutter Rex Manufacturing Co. v. United States,* 534 F.Supp. 331 (E.D.La.1982) does not persuade the Court otherwise. The outcome of that case was contingent upon the court's interpretation of regulations promulgated under the Armed Forces Procurement Act, 10 U.S.C.A. § 2301 et seq., and the Small Business Act, 15 U.S.C.A. § 631 et seq. To implement the Federal Government's policy, that a fair proportion of its purchases and contracts be placed with small business concerns, certain agency regulations provide that the entire amount of a contract shall be set-aside, under certain circumstances, for exclusive small business participation. This overall policy was deemed by Congress to be in the national interest as part of our national defense. Plaintiff was a manufacturer excluded from competing for a contract that was set-aside for small business concerns. Plaintiff was excluded because of its size. The district court upheld the exclusion.

The distinguishing features of the case are transparent. The court was faced with the task of determining, inter alia, whether Plaintiff was being deprived of a property interest without due process of law. No equal protection interests were implicated. Thus, no strict scrutiny was applied by the court. Moreover, the broadly worded statutory language construed by the district court referred to the totality of government procurement. No such reference is apparent in the instant case from any of the features of the county's race-conscious policy. Accordingly, the county can take no comfort from the Rutter case.

availability is a determination made solely by the county. There is no procedure by which an aggrieved White prime contractor can seek an administrative waiver from his exclusion under the set-aside.[42]

23. Finally, it is unquestioned that the county's set aside has an adverse effect on innocent third parties, in this case, White prime contractors. Solely because of race, a White prime contractor is precluded from submitting a bid on the Earlington Heights station.

24. In summary, the county's 100% set-aside amounts to an impermissible preference of one racial group over another and therefore cannot stand.[43] It is a constitutionally inappropriate means of serving the purpose for which it was designed. The selection of a Black prime contractor does not reasonably increase the overall Black participation in the Metrorail system where that objective can be achieved by other, less intrusive, alternatives. When a race conscious remedy has totally excluded an individual from a substantial benefit solely on grounds of race, it cannot stand. The county will therefore be enjoined from applying the set aside provision of Ordinance 82–67 to the Earlington Heights Contract.

■ 25. SUBCONTRACTING GOALS. The second major feature of the county's race-conscious policy is the application of a goal of 50% of the dollar value of the prime contract for Earlington Heights to be sub-contracted to Black contractors. This goal is contingent upon the availability and capability of Black contractors to do the work.[44] There is however a waiver provision included in this section in which a qualified bidder may "demonstrate that he made every reasonable effort to meet the goal and notwithstanding such effort were [sic] unable to do so." What this means simply is that a successful bidder must either insure that there are sufficient Black subcontractors to do 50% of the dollar value of the contract or demonstrate why, after making a good faith effort, this goal could not be met.

Plaintiffs challenge the 50% goal principally because they assert that it is unreasonably high under the circumstances presented by this record. The Court does not agree. Although the issue is an extremely close one, the Court finds that the goal imposed by the county is reasonably related to the objective of increasing Black involvement in county construction contracts and that the fifty percent participation rate is not excessive in light of the racial realities that presently exist in Dade County.[45]

26. The difficulty with this part of the county's race-conscious program lies not with the use of a goal itself but with the high numerical percentage chosen by the county. There is nothing wrong with a local ordinance and resolution enacted by a county commission. Third, eligibility for the Section 8(a) program includes all concerns owned by socially or economically disadvantaged persons; thus, the classification is not on the basis of race nor is participation solely restricted to a particular minority group, unlike the ordinance and resolution under review. Finally, the plaintiffs in *Ray Baillie* had no standing to challenge the constitutionality of the program and its administration. 477 F.2d 709–10.

---

42. In sharp contrast to the county's set-aside, the PWEA set-aside upheld in *Fullilove* had a comprehensive administrative scheme for granting waivers. See *Fullilove*, supra, 448 U.S. at 469–71, 100 S.Ct. at 2770–71. (Burger, J.).

43. The county also relies heavily upon the Fifth Circuit case of *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir.1973). This case does not alter the Court's determination that the 100% set-aside is impermissible. First and most important is the fact that the Fifth Circuit in that case expressly declined to reach the "discrimination" or equal protection issue. Second, the Small Business Administration is a federal agency and the challenged Section 8(a) program was found by the court to be "supported by Congressional and presidential mandates." 477 F.2d at 705–708. In sharp contrast, the challenge in the present case is to a

44. Contracts awarded under this provision also require that the Black subcontractor have a place of business within the Dade County geographical area.

45. See Finding of Fact No. 48.

numerical goal or quota *per se.*[46] Affirmative action plans containing goals ranging from 2% to 50% have been upheld by the courts under a variety of factual situations.[47] Although there has been some discussion about the semantical distinction between impermissible quotas and flexible racial preferences or goals, *Valentine v. Smith, supra* at 510 n. 15, *Bakke,* supra 438 U.S. at 317, 98 S.Ct. at 2762, there is nothing illegal about the use of a goal so long as it contains sufficient flexibility to distinguish it from an impermissible quota.

The question then arises whether this 50% goal is reasonably related to its objective of attracting more Black participation in county construction contracting. To survive strict judicial scrutiny, the same test applies to the numerical goal that was previously applied to the set-aside.

27. The numerical goal suffers from several of the same disabilities as the set-aside. For example, the program has no definite expiration period incorporated into the race-conscious ordinance itself. Its duration is entirely at the discretion of the county commission. They may continue the program indefinitely or terminate it at once.

The use of a numerical goal has an adverse effect on innocent White contractors since it compels a preference for Black contractors. This consequence is less severe than the set-aside since it leaves one-half of the dollar value of a prime contract available for White contractors without any restrictions. Consequently, its adverse effect is more widely dispersed than the set-aside.[48]

28. Even with these liabilities, the numerical goal portion of the county's race-conscious program is not without important support. First and most importantly, it has a reasonable waiver provision built in that will ameliorate any hardships on a particular prime contract. If one-half of the value of the prime contract cannot be awarded to responsive, eligible Black contractors, the percentage can be adjusted downward to reflect the economic realities that exist. This is in stark contrast to the set-aside.[49]

Alternative remedies do exist but they consist generally of those previously mentioned in the discussion of the set-aside: educational and administrative assistance, financial guarantees, increased awareness of potential opportunities. In this situation the obvious alternative remedy is to select a lower percentage as a goal. Other than that there are no readily available alternatives to the use of a numerical goal.

29. Up to this point in our analysis of the 50% goal there is no obvious determination regarding the constitutionality of this feature. Both the waiver provision and the

---

**46.** Whether the county describes its remedy as a quota or a goal, it is a line drawn on the basis of race and ethnic status. *Bakke,* supra, 438 U.S. at 289, 98 S.Ct. at 2747.

**47.** See *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (50% of the openings in newly created in-plant training programs reserved for Blacks); *Schmidt v. Oakland United School District,* 662 F.2d 550 (9th Cir.1981), vacated and remanded on other grounds, —— U.S. ——, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982) (25% MBE set-aside on school construction projects); *Valentine v. Smith,* 654 F.2d 503 (8th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (requiring 25% of the faculty hired between 1976–1979 to be Black); *Local Union No. 35 etc. v. City of Hartford,* 625 F.2d 416 (2d Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) (15% level of minority and women employment with regards to city's major construction contracts); *Associated General Contractors of Massachusetts, Inc.*

*v. Altshuler,* 490 F.2d 9 (1st Cir.1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) (20% minority hiring goal on state construction projects); *M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D.Tenn.1981) (2.5% MBE set-aside and a 1% WBE set-aside on state highway construction projects).

**48.** Cf. *Fullilove,* supra 448 U.S. 515, 100 S.Ct. at 2793 (Powell, J.).

**49.** Although the county suggests that there is a de facto waiver provision in the set-aside because three eligible Black contractors must be available before any contract can be set-aside, this is not a waiver. Under the county's plan, the county is solely responsible for determining whether the requisite Black contractors exist. A waiver however permits the contractor to participate even if he cannot locate the required number of Black subcontractors so long as he makes a good faith effort.

lack of practical alternatives lend support to the conclusion that it is a constitutionally appropriate means of serving the county's objective of increasing Black contractor participation in its contracting. Conversely, the 50% goal is indefinite in duration and adversely impacts innocent White subcontractors. The ultimate determination therefore depends on whether there is a reasonable relationship between the 50% goal and the percentage of Blacks in the population of Dade County.[50]

30. Once the basic concept of a race-conscious numerical goal has been constitutionally approved, the percentage goal selected is largely a matter of discretion.

[I]f a 15 percent quota is legal, so also is a 30 percent, a 50 percent, or a 75 percent quota. See *United Steelworkers v. Weber,* 443 U.S. 193, 208, 09, 99 S.Ct. 2721, 2730, 31, 61 L.Ed.2d 480 (1979). Consequently, there is no distinction in the figures. The only giant step has now been taken and judicially approved. From 15 percent to 75 percent is simply the continuance of a process already under way, and there is no logical stopping place in between.

*Local Union No. 35, etc. v. City of Hartford,* 625 F.2d 416, 428 (2d Cir.1980) (Van Graafeiland, J., dissenting).

The Court's function in this case is limited to deciding whether the county commission abused its discretion when it chose a 50% goal for the Earlington Heights contract. While the county's 50% figure may have been high, it is not unreasonable under the circumstances of this case.

Federal courts have a responsibility to take into account the interests of state and local authorities in managing their own affairs consistent with the constitution. Due deference should be given to the political body charged with developing a race-conscious plan to meet local conditions. A number of considerations could have supported the percentage goal selected:

a. Testimony adduced at the final hearing indicated that the county's goal was based largely on the availability of Black contractors to do the work.[51] The Earling-

---

50. The Court rejects plaintiffs' contention that a more significant relationship is that between the percentage of Black contractors available and eligible to participate in a specific county contract and the percentage of the county contracts actually awarded to Black contractors. The relationship of the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force has already been judicially approved. See *Fullilove,* supra 448 U.S. at 510, 100 S.Ct. at 2791 (and cases cited) (Powell, J.)

51. The following colloquy took place between the Court and witness Sergio Pereira:

THE COURT: One more question. I will try to phrase it like I did with the young lady.

Would you describe for me—sit back and take your time—the exact criteria that you used in arriving at the MBE 50 percent goal?

THE WITNESS: The criteria, Your Honor, was submitted to us by the department, and—

THE COURT: What department?

THE WITNESS: The Transportation Department.

THE COURT: Somebody from the Transportation Department said, quote-unquote, make it 50 percent?

THE WITNESS: No. If I may find it—

THE COURT: Take your time.

Mr. Witness, let me explain. What I am concerned with—and maybe you can just tell me this in your own words without going through all of those documents, once we have a goal program, doesn't there have to be some criteria whether the goal is ten percent, 20 percent, 50 percent or 97.2 percent?

THE WITNESS: The criteria here that is being established is 50 percent. Each department is required to present a suggestion to the contract review committee as per the ordinance.

The ordinance is established because of legislative findings which have been described here in the courtroom.

The department then takes into consideration the number of dollars, contract dollars, that they have awarded, the number of Black contractors, prime contractors and subs that have participated in those awards, and then also look at some of the intangibles, because we do look—I look at least, and I am not going to speak to the other members of the committee, but as chairman of the committee, in order to reach my decision, I also look at some of the intangibles, where is this job, what is the purpose, the public purpose of this job, so on and so forth.

All of those things put together constitute the criteria whereby the department submits a particular goal to the contract review committee.

In this particular case, taking all of those things into consideration, and also looking at the economic impact, the highest economic impact into the black community, the availability

ton Heights contract was originally envisioned to have a 44% MBE goal. It was later changed to a 50% Black participation goal on the grounds that there were more Black contractors available and capable of doing the work. While this should not be the only consideration, it is certainly a legitimate concern. If there are not enough Black contractors available and capable of performing under the contract, no realistic figure can be chosen.

b. A higher goal, if it does not inordinately infringe upon the rights of innocent third parties, will be more effective since it will encourage the formation of Black MBE's and their participation in the local construction industry.

c. This community is uniquely tri-ethnic and Black residents are not even the largest minority group. Members of the Hispanic community make up fully 41% of the total population. Black-owned businesses have not only failed to keep pace with the White community, they have fallen behind their counterparts in other areas of the nation. An accelerated goals program could reasonably be considered necessary in arresting this apparent slide by Black contractors.

d. No one in this community can ignore the racial problems that currently exist. These problems have been fully documented in the reports that make up this record and that formed the basis for the county's findings that past discriminatory practices have to some degree adversely affected and impaired the competitive position of Black-owned businesses so that they have not fully shared in the county's economic growth. The county commission, the legislative body of the local government, is charged with preserving the public welfare.[52] It should therefore be granted considerable latitude in implementing affirmative action goals where the need exists in the community.

e. The record shows that this contract is but one out of twenty. It is located in the Black community and is a visible symbol of Black participation in the Metrorail system and county construction contracting in general. The symbolic importance of fostering Black participation is a legitimate consideration by the county government in setting a reasonable percentage goal for Black involvement.

f. Justice Powell's suggested benchmark of reasonableness in *Fullilove*, 448 at 513–14, 100 S.Ct. at 2793, consisted of a determination that the 10% MBE under consideration there fell roughly halfway between the percentage of minority contractors and the percentage of minority group members in the nation. This equation, though helpful, is not meant to be a formal *per se* rule to be applied regardless of circumstances. Admittedly, under Justice Powell's rule of thumb a goal of roughly 9% would be permissible since only 1% of the contractors in Dade County are Black and the Black population is 17%. Any figure higher than 9% would be questionable. Under the conditions that presently exist in this county, however, a numerical goal considerably higher than 9% is warranted.

31. It is not within the prerogative of this Court to advise the county commission as to the wisdom of its affirmative action plan. It is the political body that must be responsive to the needs of the residents of Dade County and should be accorded considerable discretion in its policy making function. An affirmative action plan designed with the objective of increasing Black involvement in county contracting without unnecessarily excluding others on the basis of race does not violate the constitution when it is narrowly tailored to redress the present effects of past discrimination. The county's 50% goal is so tailored.

## V.

The Court has ruled in part IV of this opinion that the one hundred percent set-aside procedure established by Ordinance 82–67 and applied to the Earlington

---

of the subcontractors, the capability of those subcontractors in the different sub trades, the department reached a goal of 50 percent.

**52.** Home Rule Charter, Art. I § 1.01; Fla.Stat. Ann. S125.01.

Heights Station in Resolution R–1350–82 is constitutionally impermissible. The percentage goal applied to the Earlington Heights Station has survived strict scrutiny and falls within the discretionary powers of local government.

The Court has jurisdiction in this matter to enter a declaratory judgment and an injunctive decree. On the basis of the conclusions of law reached in this opinion the Court will issue:

a. A declaratory judgment declaring that the defendants have violated the Fourteenth Amendment to the United States Constitution, Article 1, Sections 2 and 9 of the Florida Constitution, and 42 U.S.C. Section 1981 and Section 1983 by implementing and enforcing racially discriminatory ordinances, resolutions, and policies requiring that Black only prime contractor set-asides be established for selected Metropolitan Dade County construction projects to be bid and awarded; and

b. A permanent injunction permanently enjoining the Defendants, and each of them, their agents, employees, and successors from enforcing ordinances, resolutions, bid specifications, bid advertisements, and policies mandating that a Black only prime contractor set-aside be established for the Earlington Heights Metrorail Station, contract no. N336R.

A declaratory judgment and permanent injunction will be issued by separate order. The Court will reserve jurisdiction to consider an award to plaintiffs of costs and attorneys fees pursuant to 42 U.S.C. § 1988 upon appropriate post-trial motion.

## VI.

The extent to which the government may employ race-conscious measures to rectify the continuing effects of past discrimination has become one of the most vexing social issues of our time. The ultimate objective of all affirmative action programs remains the same: to bring to an end the racial divisions that divide our country by placing minorities disadvantaged by discrimination on a relatively equal footing with the rest of society. Unfortunately, this cannot be done without adversely affecting others.

Undeniably there are risks in affirmative action programs. In the short run they may exacerbate rather than diminish race-consciousness. They may cause resentment. They may foster the belief that some need special advantages because they cannot succeed on their merits. This court has therefore proceeded cautiously, approving affirmative action plans where their purpose and need has been appropriately established, their goals have been reasonable in terms of the affected minority, and their tendency to reinforce race consciousness has been minimized.

*Local Union No. 35 v. City of Hartford,* 625 F.2d 416, 421 (2nd Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

The undersigned judge has intensively wrestled with these issues over the short period this action has been pending. Even if more time for reflection had been available, it's unlikely that the solution would have come any easier. There are no easy solutions where one individual's right to be free from discrimination directly conflicts with another's right to be made whole from past discrimination. This "catch-22" has been aptly expressed by Justice Blackmun in *Bakke* where he observed that "[i]n order to get beyond racism, we must first take account of race. There is no other way." Id. 438 U.S. at 407, 98 S.Ct. at 2807 (separate opinion).

The defendants are the duly elected and appointed members of this county's government. They are to be commended for their efforts to overcome the effects of discrimination against the Black members of our community. It is clear that the race-conscious measures taken by the defendants were motivated by the best of intentions and were designed to involve members of the Black community in an important part of county life. One of these measures, the set-aside, however, went further than was necessary and resulted in an unlawful pref-

erence for one racial group over another. Such a racial preference cannot be sustained. The other measure, the 50% goal, is narrowly tailored to achieve its intended purpose and is reasonable under all of the circumstances. It will be upheld.

As we well know, the Constitution is not yet color-blind.[53] The moment it was decided that our Constitution permits the government to classify individuals based solely upon their race, however well intentioned, the command of the equal protection clause was muted and the courts became embroiled in deciding when discrimination is proper and under what circumstances. Someday the color of a person's skin will be about as important in constitutional adjudication as the color of that person's hair is today. That day cannot come too soon, but until it does, judges will face difficult constitutional decisions regarding the propriety of benign racial discrimination.

Our ultimate objective as a nation to be free from governmentally imposed racial distinctions of any kind has been cogently summarized by Justice Powell in *Fullilove*, 448 U.S. at 517, 100 S.Ct. at 2794, where he stated:

> In the history of this Court and this country, few questions have been more divisive than those arising from governmental action taken on the basis of race. Indeed, our own decisions played no small part in the tragic legacy of government-sanctioned discrimination. See *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *Dred Scott v. Sanford,* 19 How. 393 (60 U.S.), 15 L.Ed. 691 (1857). At least since the decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Court has been resolute in its dedication to the principle that the Constitution envisions a Nation where race is irrelevant. The time cannot come too soon when no governmental decision will be based upon immutable characteristics of pigmentation or origin. But in our quest to

achieve a society free from racial classification, we cannot ignore the claims of those who still suffer from the effects of identifiable discrimination.

DONE AND ORDERED in chambers at Miami, Florida, this 16th day of December, 1982.

---

**53.** See *Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J. dissenting); *Fullilove v. Klutznick,* 448 U.S.

448, 522–23, 100 S.Ct. 2758, 2797–98, 65 L.Ed.2d 902 (1980) (Stewart, J. dissenting).